## HOOVER CO. v. NATIONAL LABOR RELATIONS BOARD.

### No. 11223.

United States Court of Appeals,
Sixth Circuit.
July 9, 1951.

Donald K. Merwin, Richard G. Mc-
Cuskey, Canton, Ohio (Donald K. Merwin,
Richard G. McCuskey, Canton, Ohio, on
the brief, Black, McCuskey, Souers &
Arbaugh, Canton, Ohio, of counsel), for
petitioner.

Herschel Kriger, Canton, Ohio (Her-
schel Kriger, Canton, Ohio, on the brief),
for charging parties amicus curiae.

Isadore J. Gromfine, Washington, D. C.
(George J. Bott, David Findling, A Nor-
man Somers, Owsley Vose, and Arnold
Ordman, all of Washington, D. C. on the
brief), for respondent.

Before HICKS, Chief Judge, and AL-
LEN and McALLISTER, Circuit Judges.

McALLISTER, Circuit Judge.

This is a petition of The Hoover Com-
pany asking that an order of the National
Labor Relations Board requiring petitioner
to reinstate certain employees who were the
executive members of the board of a local
union and to desist from discrimination, be
vacated. In answer, the Board asked for
enforcement of its order.

The background of the case is as follows:
In August, 1942, Local 709 of the United
Electrical, Radio & Machine Workers of
America (CIO), hereafter referred to
as the United Electrical Workers, was

certified by the National Labor Relations Board as bargaining agent for The Hoover Company's production and maintenance employees; and from time to time thereafter, collective bargaining agreements were entered into between the company, on the one hand, and the Local and the International union, on the other, the last of which contracts expired by its terms on April 30, 1948. Prior to its expiration, each of the parties to the contract notified the other of its intention to terminate it, and negotiations toward a new contract had taken place prior to its expiration. These negotiations, however, did not result in a new contract or in an extension or modification of the old one, and were broken off after the date of the expiration of the contract then in effect.

The Hoover Company thereafter refused to recognize or deal with the International or the Local until they complied with Section 9(f), (g), and (h) of the National Labor Relations Act, 29 U.S.C.A. § 159 (f–h), which, among other requirements, provides that before an investigation by the Board of any question concerning representation of employees raised by a labor organization, or before the filing of any complaint issued pursuant to a charge made by a labor organization under the Act, each officer of such labor organizations, and any national or international labor organization of which they are affiliates or constituent unions, file with the Board affidavits executed comtemporaneously or within the preceding twelve-month period that he is not a member of the Communist party, and is not a member of, or does not support any organization that believes in or teaches the overthrow of the United States government by force or by any illegal or unconstitutional method. The officers of the Local and International union in question refused to comply with the provisions of the Act.

On May 2, 1948, the membership of the Local held a meeting at which the executive board of the Local was authorized to call a strike of the employees of The Hoover Company, and to take other action deemed necessary by them. On May 7, the company filed a petition with the Board,

alleging that a question of representation existed at its plant, naming the International and Local as claimants of the right to represent petitioner's production and maintenance employees, and asking for a representation election. Subsequently, said petition was investigated by the Board and notice thereof was served upon the Local and International, advising them of their rights thereunder. The Local and the International having failed to comply with the provisions of paragraphs (f), (g), and (h) of Section 9 of the Act, the Board thereafter, on May 26, dismissed the company's petition because, on account of the failure of the Local and the International to qualify for a place on the ballot in a representation election, the purposes of the Act could not be effected.

On June 10, the Local, by the authority of its executive board, called a strike of the company's employees. Mass picketing, according to the president of the Local, was directed by the Local executive board, and began immediately at the gates of the company's main plant and general offices. At that time, the Local publicly declared, in an official strike bulletin, that the strike was called because The Hoover Company refused to renew the contract with the United Electrical Workers, and was refusing to deal with the union. The president of the Local admitted that he had taken part in the mass picketing, and knew of only two of the members of the Local executive board who did not also participate in such picketing.

On the following day, June 11, under the direction of the executive committee, all gates to the petitioner's plant were barred by mass picketing; and all persons, except the company's unarmed guards, desiring to enter the premises, were prevented by the massed pickets from doing so.

During the period from June 10 to June 23, some instances of violence took place at and in the vicinity of the gates to petitioner's plant, and access thereto was barred by mass picketing, which was thereafter enjoined by an order of the Court of Common Pleas of Stark County, Ohio, on June 23, following which work was resumed at the company's plant and its

employees returned to work in increasing numbers. On July 19, the time of the annual vacation period, about 60% of all of the workers in the unit and all office employees had returned.

Prior thereto, however, on July 7, 1948, the Hoover Employee Committee, an independent labor organization, hereinafter referred to as HEC, filed its petition for the determination of a question of representation with the Regional Office of the Board, claiming the exclusive right to represent petitioner's production and maintenance employees at the plant in question. Following a preliminary hearing on this petition, which was attended by representatives of the Local and International, it was agreed, on July 21, 1948, that a consent election be held on August 17, 1948. The United Electrical Workers union was not on the ballot because of the refusal of its officers to sign the non-Communist affidavits; but the union carried on a vigorous campaign with parades, rallies, meetings, and the distribution of handbills calling upon all employees to vote no on the proposition whether the HEC would be their bargaining agent. Apparently all the employees of the company voted in the election, and the result was that the HEC received a majority vote, and was thereafter, on August 24, certified as the exclusive bargaining agent for the company's production and maintenance employees.

In the meantime, on July 19, the company's plant closed down for the annual two-week vacation, and remained closed until August 2.

During the period of the strike, and after the filing of the petition and the commencement of the representation proceeding before the Board by the HEC, the Local of the United Electrical Workers, on July 13, acting upon the recommendation of certain representatives of the International and members of the Local executive board, voted to instigate, promote, and place in effect a national boycott of the company's products, jointly with the International, in order to support the strike then going on and to achieve the same purposes as the strike, namely, recognition by the company as the bargaining representative of the employees, and execution by the United Electrical Workers and the company of a contract. Immediately thereafter, members of the executive board of the Local and various representatives of the International collaborated in the preparation of various publicity material for use in promoting the boycott, and organized ten teams of striking members of the Local who toured various cities and towns in the eastern half of the United States to promote the boycott and secure the aid of other locals and district councils of the International in promoting and effectuating the boycott.

In carrying out the boycott, the other locals and district councils of the International who were called upon by the teams were requested to and did distribute mimeographed and printed postcards to their members for mailing to the company, and were asked to write letters to the company's dealers and to distribute other publicity material, which they did. The International fulfilled its part in promoting the boycott by articles and photographs, published in its official weekly newspaper and distributed to its members. The national boycott of the company's products has never been stopped, and, at the time and after the time of the hearing in this case by the trial examiner, was still in effect.

On July 30, 1948, on the recommendation of the Local executive board, the members of the Local voted to return to work, one of the purposes of such return to work being to vote in the election against the HEC as the bargaining unit.

However, at the same meeting at which it was voted to abandon the strike, it was voted to intensify the boycott to "make the Company realize that the UE-CIO is the only bargaining agent for Hoover workers." The boycott policy was stated by the board in a handbill which was passed out at the meeting, as follows: "Suggested Program of Activities During the Period Until the Election. . . . During this period both the Local Union and the International Union will continue and intensify its boycott compaign against the Company. This campaign is receiving a tremendous response throughout the country and The Hoover Company is beginning

384

to feel its effects. Defeat of the Company-Union and the effects of the boycott campaign will make the Company realize that the UE-CIO is the only bargaining agent for Hoover workers. We can defeat the Company Union. We can get a contract. Do your part. Do Your Part."

On August 2, virtually all of the members of the union, who had theretofore remained out on strike, returned to work, including the employees who were members of the Local executive board, the charging parties here.

Upon their return to work on August 2, the representatives of the company called a meeting with these employees who were members of the Local executive board, herein referred to as the charging parties, at which the president of the Local and nine members of the executive board appeared. The vice president of the company then inquired if they were intending to continue the boycott, according to their statement in the newspapers, and asked them if they wished to confirm that fact at the meeting. Not receiving any response to this question, the vice president of the company asked the members of the executive committee who were present whether they considered it entirely ethical to continue to work at The Hoover Company, draw wages, and, at the same time, do everything they could to interfere with the sale of Hoover products. He was answered by the president of the Local that they had worked there before and were not called Communists. The vice president of the company then asked that each of the members of the executive board of the Local inform him whether, in view of their employment, they still intended to continue the policy of attempting to boycott the sale of Hoover products; but the union president blocked this answer, saying he would like to have the rest of the board there, and again asked the vice president of the company what he wanted to know. The vice president then asked again whether the employees present were in agreement with the policy of the officers of the executive committee to continue the boycott of the sale of Hoover products; and that

he wanted to be sure that "all you men are in agreement with this policy." At this, the president of the Local replied that the policy was decided by a majority of the executive board and it was out of order to ask for the individual views of the members of the board then present. The vice president then said that in view of the consequences, he thought each of the individuals had a right to express himself, and stated to them: "If no one wants to speak up we will take it for granted that everyone in this room is in agreement that you intend to intensify the policy of boycotting Hoover products while you are in the plant here and drawing wages." At this, one of the members of the Local executive board spoke up and asked the president of the Local what would be wrong with discontinuing the boycott at that time. The president answered: "It would be out of order. It should be decided by the Executive Board, and the Executive Board goes along with the wishes of the rank and file employees." The vice president of the company then stated to the group: "If that is your attitude and no one wants to speak up, all that I can say is that until and unless you publicly rescind this policy, all of the members of your Board and officers are indefinitely suspended from working here." Later, in another meeting with the members of the Local board who asked what it was necessary to do to be reinstated, the vice president asked that there be official action by the Local that the boycott be called off, that public announcement to this effect be made to the press and radio, and that telegrams be sent to all co-operating unions and organizations who had been told of the boycott, notifying them that the boycott was called off; and that the company would send and pay for the telegrams. Upon refusal to take such action, the employees constituting the Local executive board, who were then under suspension, were discharged.

Upon their petition, the Board ordered the company to reinstate the members of the Local executive board, with back pay, and to post notices that it would not interfere in the future in the employees' right

of self-organization; and it is this order that the company asks us to review.

Many questions are raised and discussed at length in the briefs of the parties, and were likewise submitted to the court in the comprehensive and able arguments of counsel for the Board, for the petitioning company, and for the charging parties. However, after a painstaking examination of the record, together with the exhibits in the case, and upon a consideration of the various contentions advanced, we have come to the conclusion that the controlling issues are: (1) whether the institution and maintenance of the boycott, under the circumstances of this case, was a concerted activity for the purpose of collective bargaining or other mutual aid and protection, which was protected under the provisions of the Act; and (2) whether, if such boycott was not protected, the activities of the members of the executive board—the so-called charging parties herein—in maintaining the boycott, constituted cause, within the meaning of the Act,[1] for their suspension and discharge from employment.

From the facts above set forth, it appears that when the boycott was instigated and put into effect, there was pending a proper legal proceeding, on petition filed by the HEC, for an election to determine the bargaining representative of the employees in question. It was upon this petition that the election was subsequently held in which the HEC received a majority and was thereafter legally certified by the Board as the exclusive bargaining agent for the employees. The HEC has since become a local of the American Federation of Labor, and for the past three years, has had contracts with the company. The boycott was instituted to compel the company to recognize the United Electrical Workers union as the bargaining agent for the employees, and to execute a contract with it during the pendency of the representation proceeding and before the employees could vote in the election afterward called by the Board to choose a bargaining agent. It is said by counsel for the Board that the union "immediately after the election of

August 17, realizing that *the impending certification of the HEC would make its boycott for recognition unlawful,* abandoned its original objective and told petitioner that the Union would lift the boycott if petitioner reinstated the * * * four other discharged employees." But, for the reasons stated, its boycott for recognition was unlawful *during the pendency of the representation proceeding, before the election;* and our views as to the alleged abandonment of the purpose of the boycott are hereafter outlined.

At the present time, the Act specifically makes it an unfair labor practice on the part of a labor organization to engage in, or induce or encourage the employees of any employer to engage in, a strike or a concerted refusal to use any goods, articles, or commodities, where the object is to force an employer to recognize or bargain with a particular labor organization as the representative of his employees, if another labor organization has been certified as the representative of such employees. 29 U.S.C.A. § 158(b)(4)(C). But even before that conduct was made an unfair labor practice by statutory enactment, it was held by the Board that a strike to compel an employer to recognize the striking union in the face of a Board certification of another labor organization, was not an activity entitled to the protection of the Act, the Board saying: "There would be neither moral, legal, nor practical justification for our requiring employees to respect our certifications if we were unwilling to respect them ourselves." Thompson Products, Inc., 72 N.L.R.B. 886, 889.

█ Under the Act, when a petition is filed by an employee or a group of employees alleging that a substantial number of employees wishes to be represented for collective bargaining, the Board is directed to investigate such petition, and if it has reasonable cause to believe that a question of representation affecting commerce exists, it is further directed to provide for an appropriate hearing upon due notice; and if it finds that such a question of repre-

---

**1.** Section 10(c) of the Labor-Management Relations Act of 1947, 29 U.S.C.A. § 160(c).

sentation exists, it is required to direct an election by secret ballot and to certify the results thereof. 29 U.S.C.A. § 159(c) (1) (A) and (B). A boycott instituted by a union, as in this case, during the pendency of proceedings for an election ordered by the Board, to force the employer to recognize it as the bargaining agent of the employees in preference to a competing labor organization, was a direct interference with the Board's election procedures and with the right of the employees to select bargaining representatives of their own choosing. If, during the pendency of these proceedings for an election to determine the bargaining agent, The Hoover Company had recognized the United Electrical Workers as bargaining agent, it would have been guilty of an interference with the Board's election procedures, as well as an unfair labor practice, in violation of Section 8(a)(1) of the Act,[2] for interfering with, and restraining its employees in the exercise of their right of self-organization and the right to bargain through a representative of their own choosing. For an employer is obliged to remain neutral and can not recognize or bargain with one of the two or more unions competing for such recognition during the pendency of a representation proceeding. If the company, therefore, had recognized the United Electrical Workers union during the pendency of the representation proceedings, it would have been guilty of an illegal act; and a boycott to compel it to commit an unlawful act would obviously be for an unlawful purpose. The Act does not confer absolute right upon employees to engage in every kind of strike or other concerted activity; and the fact that certain concerted activity is explicitly protected by the statute, does not mean that improper concerted activity is also protected. For it is not necessary that such improper activities be explicitly excepted from the protection of the statute. The rights set forth in the Act are not to be considered as including the right to commit or participate in unfair labor practices or unlawful concerted activities; and the courts have firmly established the rule that under the provisions of Section 7 of the

Act,[3] employees are not given any right to engage in unlawful or other improper conduct. International Union, Auto Workers, v. Wisconsin Employment Relations Board, 336 U.S. 245, 69 S.Ct. 516, 93 L.Ed. 651. In this case, since the United Electrical Workers union was guilty of instigating a boycott for an unlawful purpose, such concerted activity was not protected by the Act. The Hoover Company, therefore, had the right to discharge or refuse to reinstate those employees who were engaging in and maintaining a boycott to force it to recognize the United Electrical Workers union while representation proceedings were pending on the petition of a competing union to select a bargaining representative.

However, the members of the Local executive board, who are the charging parties in this case, contend that the purpose of the boycott thereafter changed, and its objective became subsequently proper and lawful; that, as a concerted activity, it was, therefore, protected by the Act; that the company had no right to discharge an employee for thereafter engaging in such boycott; and that the discharges in this case were discriminatory and in violation of the Act.

The basis for this contention is as follows: Two days after the balloting at which the HEC was declared the victor in the representation election, the president of the Local called the vice president of the company by telephone and said that the committee of the executive board wanted to see him about the boycott, and have a meeting to find out what they would have to do to come back to work. The meeting was, accordingly, arranged, and the company then informed the committee what it would ask in the way of action to publicize its termination, which has heretofore been mentioned. The members of the committee then said they would have to take it under consideration, and the company asked that the committee notify it of its decision by the following Monday. The president of the Local thereafter called the company and arranged for another meeting to discuss the subject further, and

2. 29 U.S.C.A. § 158(a) (1).

3. 29 U.S.C.A. § 157.

an appointment was made. At this meeting, the members of the committee of the executive board of the Local stated the matter of lifting the boycott had been discussed at a membership meeting of the union, but that no vote had been taken by the members in regard to it. The committee had been instructed to come back and make a proposal to the company, setting forth the conditions on which they would terminate the boycott. These conditions were that the company would reinstate four employees, three of whom had been discharged for violence during the strike, and the fourth, for falsifying time cards. The vice president stated that under no circumstances would the company reinstate these four persons; and it refused to do so. The committee then said that the membership had not voted on the question, and it was thereupon agreed between the company and the committee to postpone decision on the question of reinstatement until the following Monday morning. Thereafter, the members of the executive committee of the Local met and voted upon the proposal of the company that the boycott be terminated. The vote was five to five, with two members abstaining from voting. Subsequently, at a sparsely attended meeting, on August 29, about 40 members voted to continue the boycott, and 20 members voted against it. At this time, apparently, the membership of the United Electrical Workers Local, which had 1800 members before the boycott, had dwindled so greatly that only 50 or 60 members could be found to attend this crucial meeting. The committee of the Local executive board did not thereafter communicate further with the company, and on August 30, in accordance with the notice previously given by the vice president, the employees who were members of the Local executive committee and who, at that time, were under suspension, were finally discharged.

Did the purpose of the boycott change and its maintenance thereafter become a proper legal concerted activity protected by the Act? The boycott was originally instituted to force recognition by the company of the United Electrical Workers union as the bargaining agent of its employees. This was its expressed purpose.

Thereafter, although the strike was called off, the boycott, at the same time, was intensified. The fact that the Local agreed to make a deal with the company to call off the boycott provided the company would reinstate four employees, discharged for cause, did not change the expressed purpose of the boycott, and did not convert a boycott with an unlawful purpose to one with a lawful purpose. As mentioned, one of the employees was discharged for falsifying the records, and the other three, for violence. One of those discharged for violence filed no charges against the company for the purpose of reinstatement. The other three were among the charging parties in this case in its earlier stages. Later, their charges were included in a separate case; but the Regional Director refused to issue a complaint on such charges; and counsel for the charging parties in the instant case states that the general counsel for the Board dismissed the charges filed in their behalf. There seems no question, then, that these four employees were properly discharged for cause. Whether a boycott for the purpose of forcing an employer to reinstate an employee discharged for dishonesty or violence would be a concerted activity protected by the Act may be debatable. But we are not required to resolve this question. It is clear in this case that the purpose of the boycott did not change. That purpose was an expressed purpose. It was to boycott the company's products until the company recognized the union as bargaining agent, and executed a contract with it.

The ten teams of two members each traveled through twelve states to promote and intensify the boycott. The documentary material which was used to publicize the boycott was, according to the testimony of the president of the Local, prepared by the members of the executive board. As a result of the campaign and the activity of the boycott teams throughout the various states, more than 2,000 postcards were sent to the company from individuals in 48 different cities, telling the company

that the signers would not buy any Hoover products in the future until the company signed a contract with the United Electrical Workers union, all of the cards being sent after the pendency of the representation proceedings, and many of them being sent after the election and certification by the Board of the HEC as the employees' bargaining unit. Perhaps the greatest damage inflicted upon The Hoover Company by the boycott resulted from the action of the various locals of the United Electrical Workers that had been visited by the boycott teams. These locals, sometimes months after the election and certification of the HEC, called upon their members, and often requested all other unions in their areas, to support the boycott until the United Electrical Workers union secured a bargaining contract with The Hoover Company. More than five months after the HEC was certified by the Board as the bargaining unit, The Hoover Company received, on January 24, 1949, a letter from the International Longshoremen's & Warehousemen's Union, CIO, stating that their one hundred thousand members had been advised of Hoover's anti-labor activities and that they, in turn, would advise their families and friends of these facts and would not stand by and witness companies which depend upon the good will of the public for the sales of their products to proceed in such union-wrecking activities. The letter concluded:

"We hope that your company will change its approach to labor relations and reach a proper collective bargaining agreement with the union representing your employees —the United Electrical, Radio and Machine Workers of America.

"If we are advised to that effect, you can be assured that our members will, in turn, be told of such developments."

Further, more than five months after the election and certification of HEC, on January 22, 1949, the *UE News*, which was the official newspaper of the International of the United Electrical Workers, advised its members and all consumers to avoid buying Hoover products. On January 27, 1949, the International Union of Marine Cooks and Stewards, CIO, wrote The Hoover Company, informing it that its ten thousand members would not purchase any products made by the company until it dealt fairly with its employees. The letter concluded: "We strongly urge that you act not only in the best interests of both labor and management, but the consumer public as well, and negotiate in good faith with the representatives of UE-CIO."

During February, 1949, two other large unions informed The Hoover Company that they had placed it on their unfair list and recommended to their members not to buy Hoover products.

Neither the public nor any of the other unions or locals who were induced to assist in the boycott have ever been notified that it has been terminated, or that a new bargaining agent has been certified by the Board. Nor have they been informed by the Local or the International that the purpose of the boycott has changed and that the only reason for its continuance is the company's refusal to reinstate an employee who was discharged for dishonesty and three other employees who were discharged for violence.

It is asserted by the Board that there is no evidence that the union continued the boycott after the strike had ceased. But more than two weeks after that time, the union made a widespread distribution of leaflets urging that the boycott be intensified. Other facts make it clear that the union continued the boycott after the election. On the hearing, the president of the Local testified that no one had been notified of any change in conditions, and that as far as he was concerned, "the boycott is still on." From all that appears in the case, the boycott is still in effect at the present time. The fact that the Local did not, since the election, engage in further campaigns or propaganda in promoting the boycott is not determinative of its discontinuing it. Through the efforts of the Local executive board, the Local, and the International, they made the boycott effective, and its effectiveness depended upon the representations they made as to the refusal of the company to deal with it as the bargaining agent of the employees. The boycott is still in effect; the Local execu-

tive board refused to approve its discontinuance; the Local affirmatively acted in refusing to discontinue it; and the refusal to discontinue the boycott has been, and is the real grievance.

It is claimed that the Local was the only body that could discontinue the boycott. However, the Local executive committee, as it was described by the president, was the guiding hand of the Local. It was given authority to proceed to formulate plans for a boycott. The methods and means were left in its hands. It recommended the abandonment of the strike, which was adopted by the Local. It recommended the boycott, which was adopted. The executive board was the leader of the boycott. It refused to approve the termination of the boycott. Moreover, at the time the question of their employment arose, the members of the Local executive board were asked individually by the vice president of the company whether it was their feeling that they could draw wages from the company and interfere with the sale of the company's products; and whether they personally were in agreement with the policy to boycott Hoover products. They were asked for their individual expression as to the boycott. The vice president informed them that, "in view of the consequences," each individual should express himself on the subject, and that if no one wanted to "speak up," the company would take it for granted that everyone in the room was in agreement to intensify the boycott even during their employment. No one spoke up. The failure of any of them to do so, under the circumstances, gave rise to the reasonable conclusion that all of them, as a group, and as individuals, were supporting, and would continue to support the boycott. While a boycott is a legitimate activity on the part of a labor organization, it is not every boycott that has a lawful purpose, or is lawful or protected as a concerted activity by the statute. The employees in question were not entitled to reinstatement in view of their refusal to discontinue a boycott, the purpose of which was unlawful, and their refusal to state personally that they would not engage in, or support it, when that was made the condition of their employment.

But even if the purpose of the boycott had changed, the employees in question would not, in that case, be entitled to be reinstated. It is held that the right to strike requires that strikers who exercise it must thereby cease to work and draw their pay. National Labor Relations Board v. Montgomery Ward & Co., Inc., 8 Cir., 157 F.2d 486. An employee can not work and strike at the same time. He can not continue in his employment and openly or secretly refuse to do his work. He can not collect wages for his employment, and, at the same time, engage in activities to injure or destroy his employer's business. "It was implied in the contract of hiring that these employees would do the work assigned to them in a careful and workmanlike manner; that they would comply with all reasonable orders and conduct themselves so as not to work injury to the employer's business; that they would serve faithfully and be regardful of the interests of the employer during the term of their service, and carefully discharge their duties to the extent reasonably required. * * * While these employees had the undoubted right to go on a strike and quit their employment, they could not continue to work and remain at their positions, accept the wages paid to them, and at the same time select what part of their allotted tasks they cared to perform of their own volition, or refuse openly or secretly, to the employer's damage, to do other work." National Labor Relations Board v. Montgomery Ward & Co., Inc., supra, page 496. See United Biscuit Co. of America v. National Labor Relations Board, 7 Cir., 128 F.2d 771, where it was held that disloyalty in the performance of duties was a cause for employees' discharge. In National Labor Relations Board v. Metal Mouldings Corp., this court has had occasion to hold that a labor organizer, who was claimed to have been discriminated against in being discharged, was in fact discharged for cause since he was engaged in a program of recruiting specially trained polishers from the employment force of his employer

for new employment with a competing firm for which his father worked as foreman;[4] and in Northwestern Photo Engraving Co., 38 N.L.R.B. 813, the Board held that a discharge of a union member because he refused to assure the employer that he would discontinue his visits to the company of his former employment, which was a competitor of his then employer, was not discriminatory where the employer reasonably objected to such practice of his visiting the plants of competitors.

Of course, an employee can engage in "concerted activity for mutual aid and protection" even though it may be highly prejudicial to his employer, and results in his customers' refusal to deal with him, just as long as such activity is not a wrong done to the company. National Labor Relations Board v. Peter Cailler Kohler Swiss Chocolates Co., Inc., 2 Cir., 130 F.2d 503. In the instant case, it appears, however, that not only were the members of the Local and International, and other unions, asked to boycott the company's products, but, in the strike bulletin of the Local which was distributed to the company's employees, it was stated: "SALESMEN HELP· Salesmen · for rival cleaners have contacted Local 709 for literature about the Hoover Company's Union-busting activities. Apparently these salesmen intend to help our boycott campaign against Hoovers in order to promote the sale of their own products." It is a wrong done to the company for employees, while being employed and paid wages by a company, to engage in a boycott to prevent others from purchasing what their employer is engaged in selling and which is the very thing their employer is paying them to produce. An employer is not required, under the Act, to finance a boycott against himself.

■ ■ The Act does not destroy the right of an employer to refuse to retain in his employment or to reinstate those employees who engage in unlawful conduct toward him during a strike or other concerted activity not caused or prolonged by unfair labor practices of the employer. See National Labor Relations Board v. Ohio Calcium Co., 6 Cir., 133 F.2d 721. The company was not obliged to employ the members of the Local executive board in view of their refusal to terminate the boycott.

Finally, it is contended that, in any event, four of the employees in question, Anderson, Bucher, Watson, and Connelly, were entitled to be reinstated. It is claimed that Anderson and Bucher did not vote for the boycott, and that Watson and Connelly had opposed and voted against the boycott on every occasion on which the matter came up, and, furthermore, that they had informed the company that they were resigning from the Local executive board and the union before the final action of the company in discharging them.

Anderson and Bucher were elected to the Local executive board at the same time that the boycott was voted. They had been asked to leave the room during the election proceedings. When they returned, the boycott had been voted. They continued on as members of the board, attending various of its meetings. Anderson, but not Bucher, was at the meeting when the vice president of the company asked for individual expressions as to whether the members of the board intended to receive wages and continue the boycott at the same time, and refused to answer. When the five to five vote was taken by the board on the company's proposal that they terminate the boycott, Anderson said that he told the board he refused to vote because the company had told them that it would take his and Bucher's case under consideration for reinstatement. Bucher stated that as far as the proposal to require the company to reinstate the four discharged employees was concerned, he did not know whether the Local had voted on that question, but that he knew "they supported us on the move to·go in with a counter proposal;" and he was present with the Local executive committee when this proposal was made to the company and rejected by it. When the tie vote was taken by the Local executive committee on the proposal that the boycott be abandoned, Bucher refused to vote and said that the reason he gave

4. Order reported in 12 L.R.R.M. 723.

the board was that he was not a member of the board when the boycott was first voted, and he felt that it was up to the other members who were on the board at that time; that he "believed it should be taken off, but the issue was up to them."

Watson and Connelly were, from the beginning of the controversy, members of the executive board. They opposed the boycott from its inception. They voted to present the proposal to the company that it reinstate the four discharged employees as a condition for terminating the boycott; but when the company refused, they voted to accept the company's proposal that the boycott be terminated without conditions. Although they were present at the meeting with the company when the members of the board were asked if they intended to work and receive wages and at the same time carry on the boycott, and refused to answer, nevertheless, thereafter, while the implied offer to reinstate on the part of the company was pending, they both sought out the officials of the company and told them that they were against the boycott; that they were resigning from the Local executive board, and also from the union; and that they wanted their jobs back. Moreover, they said they were only remaining in the union until August 29 so that they could vote against the boycott at the meeting of the Local to be held on that day. Prior to that vote, each of them mailed to the company a letter stating that, effective as of August 30, they were resigning from the executive board, and also as members of Local 709, concluding: "I cannot go along with the policies of the International Officers, and some of the officers of Local 709."

■ It is our view that Anderson and Bucher did not disassociate themselves from the boycott. Although they did not vote for it in the first place, they continued on the board during the entire period up to their discharge and must be deemed to have acquiesced in the actions of the board in carrying it on and to have supported it. Before the final meeting, they met with officials of the company in an attempt to be reinstated. Bucher was the spokesman and stated that they wanted an answer to the question whether they would be reemployed, *before the membership voted on the company's proposal to terminate the boycott.* He wanted to know "what position I was in *before the membership voted on it,* because I didn't consider myself guilty. * * * I believe he stated in an off-the-record manner that he believed that we would receive the same penalty as the rest of the members of the Board. * * * we talked at great length on this answer, because I wanted to pin him down and get an answer that day *before the election.* * * * I stated that I wanted to know an answer then, because it was previous to the time, and I wanted to know if they were going to act in good faith on it." But although they were trying to find out, before the membership voted as to whether the boycott should be ended, what action the company would take as to their reinstatement, they did not inform the company what action they would take, or that they opposed the boycott or the action of the board or of the Local. Anderson and Bucher also made a tenuous claim that they were not members of the executive board because they did not take an oath of office. But it does not appear that this is necessary; they consented to be candidates for the position; they were elected; they attended the meetings and entered upon the discussions; they had the right to vote; and they made statements to the members of the board why they were not voting on the proposition before them. Their contention made in this regard lacks merit. They did not resign from the board or the union or inform the company at any time that they were opposed to the boycott.

■ As to Watson and Connelly, we are of the opinion that they were entitled to be reinstated in their employment. When, in its first meeting with the Local executive board, the company in effect made the condition of reinstatement of the members of the Local executive committee, the termination of the boycott, asking that "in view of the consequences," the individual members express themselves as to whether they supported the boycott or not, and, later, in the meeting after the

392

election, again made termination of the boycott the condition of reinstatement, it implied that if a member did whatever he could to oppose the boycott and disassociate himself from it, he would be reinstated; and the company thereby waived the right to treat such an employee as a wrongdoer. After the first meeting with the company, Watson and Connelly did everything possible to comply with such conditions. They had always opposed the boycott and voted against it, and they ended by both resigning from the executive board and the Local, informing the company that they were exerting their final efforts against the boycott and were resigning within the time agreed upon for such final decision by the company.

In accordance with the foregoing, enforcement of the order of the Board is denied, with the exception of the provision that, because of the aforesaid waiver, petitioner shall offer employees Watson and Connelly immediate and full reinstatement to their former or substantially equivalent positions without prejudice to their seniority or other rights and privileges, and make them whole for any loss they may have suffered by reason of petitioner's refusal to reinstate them in its employ as of August 30, 1948; and an order will be entered to this effect.