**NATIONAL LABOR RELATIONS BOARD
v. ELECTRONICS EQUIPMENT
CO., Inc.**

No. 120, Docket 22136.

United States Court of Appeals
Second Circuit.

Argued Dec. 13, 1951.

Decided Feb. 18, 1952.

George J. Bott, David P. Findling, A. Norman Somers, Arnold Ordman and Thomas F. Maher, Washington, D. C. (argued by Isadore J. Gromfine, Washington, D. C.), for petitioner.

Ashe & Rifkin, New York City (argued by George Rifkin, New York City), for respondent.

Before CHASE, CLARK, and FRANK, Circuit Judges.

FRANK, Circuit Judge.

1. The validity of the Board's order depends on whether the sending of the letters was a legitimate concerted activity by employees, for their mutual aid and protection, guaranteed by § 7 of the National Labor Relations Act, as amended. The Board held that it was, and that Electronics' interference with such activity was therefore a violation of § 8(a) (1). The employer argues (and the trial examiner held) that the sending of the letters was not a protected activity, because the letters had an unlawful purpose, i. e., to coerce the employer into recognizing Local 65 at a time when to do so would have been an unfair labor practice by the employer.

The following distinction must not be disregarded: (1) Of course, a union activity which is not proscribed by the Act as an unfair labor practice does not become so because it aims to induce the employer to engage in conduct which, under the Act, would be an unfair labor practice on the employer's part. (2) On the other hand, as the Board itself has held, union activity is not protected under § 7 merely because it does not constitute an unfair labor practice, to which the Board is authorized to attach penalties. The American News Co., 55 N.L.R.B. 1302; Thompson Products Co., 70 N.L.R.B. 13, as amended in 72 N.L.R.B. 886.

In the American News case, the Board held not within § 7 protection a strike to compel an employer immediately to grant a wage increase forbidden, without War Labor Board approval, by the Emergency Price Control Act of 1942. In the Thompson Products Company case, the Board held similarily with respect to a strike to compel recognition of one union after the Board had certified another union. It should be noted that, when that case was decided in February, 1947, such a strike was not an unfair labor practice; it became so only sometime after June, 1947, when the Taft-Hartley Act went into effect. The statutory interpretation, involving the above distinction, reflected in those Board decisions, seems to us entirely reasonable. Nothing in the Taft-Hartley Act or its legislative history suggests that Congress repudiated that interpretative distinction. Indeed, considering not alone the "silence of Congress" argument but also the temper of Congress when it enacted Taft-Hartley, there is good reason to conclude that Congress adopted that distinction.

In Midwest Piping & Supply Co., 63 N. L.R.B. 1060, the Board, in 1945, held it an unfair labor practice for an employer to recognize one of two unions as the exclusive bargaining agent during the pendency of the rival union's petition for certification, when (to quote the Board) the employer then knew "that there existed a real question concerning the representation of the employees." The Board said: "Such conduct * * * contravenes the letter and the spirit of the Act, and leads to those very labor disputes affecting commerce which the Board's administrative procedure is designed to prevent." On that basis, the Sixth Circuit, in The Hoover Company v. N. L. R. B., 6 Cir., 191 F.2d 380, denying enforcement of a Board order, held that § 7 did not protect a union's nation-wide boycott, accompanied by campaigns to assist salesmen of rival manufacturers to sell their products to Hoover customers, designed to compel exclusive recognition just previous to a Board-sponsored election. The court said that since the boycott sought to induce an illegal act from the employer, the purpose was *ipso facto* unlawful, and therefore could not come within the protective category of legitimate concerted activities.

The Board argues that the court, in the Hoover case, erred in failing to observe that, after the Midwest Piping decision, Congress, in the Taft-Hartley Act, (a) made it an unfair labor practice for a union to strike after certification of another union while refusing to deal similarly with (b) a strike (or other action by a union) to obtain recognition while an election is pending and before certification of another union. The Board contends that thereby Congress inferentially put (b) under § 7. The employer, on the other hand, argues that nothing in the Taft-Hartley Act or its legisla-

tive history so much as intimates a congressional intention to bring under the wing of § 7 whatever is not declared to be an unfair labor practice by a union.

2. However, we do not now decide whether, in the light of the Taft-Hartley amendments or otherwise, the doctrine of the Hoover decision is correct. For, assuming, *arguendo*, that it is, we think that this is not a Hoover-type case. As we read the court's decision in Hoover, and the Board's pre-Hoover rulings on which the court relied, union activities in this kind of case are unprotected only if the union is in fact campaigning to compel unlawful conduct by the employer. Here, however, at the time of Penchansky's discharge, the union did not go beyond a threat to strike and/or picket, plus an invitation to customers to boycott if a strike were called, or picketing were begun, and the evidence does not require a belief that the union intended at that time, if it called a strike, to do so partly in order to obtain recognition and not merely to compel re-employment of its discharged members.

Before considering the evidence pertinent to that issue, it is well to consider, from this angle, the cases already cited. In American News Co., supra, the strike was called for the sole purpose of compelling the employer to grant wage increases prior to the approval of the National War Labor Board, in defiance of the Emergency Price Control Act of 1942, 50 U.S.C.A.Appendix, § 901 et seq., and despite the fact that "throughout, the respondent (employer) co-operated with the Union and took whatever steps were deemed necessary in order to secure the approval of the wage increases. * * * There was no dispute between the Union and the respondent relating to the wage increases or otherwise, except that arising from respondent's refusal to grant the wage increases prior to the approval of the National War Labor Board." The Board said: "A critical fact which shapes our consideration of the case is that the strike was neither provoked nor preceded by unfair labor practices." Similarly in Thompson Products Co., supra, the Board based its holding, that the employees were unprotected in their strike, on a finding that

"the strike * * * was for the purpose of compelling the respondents to grant exclusive recognition to the UAW-CIO in the face of the existing certification of the Society, and not for any of the other purposes or reasons asserted by the UAW-CIO."

In Hoover [191 F.2d 382], as the Sixth Circuit said, "the Local publicly declared, in an official strike bulletin, that the strike was called because The Hoover Company refused to renew the contract with the United Electrical Workers, and was refusing to deal with the union." The background of that case made it entirely clear that the seven-month boycott was conducted for but one purpose: "to make the Company realize that the UE-CIO is the only bargaining agent for Hoover workers."

The situation is substantially different here. The union had not begun a strike or picketing. The first letter solicited a boycott by customers only in the event that a strike were called, and the second, although somewhat ambiguous on the point, may reasonably be construed likewise. There is no evidence that the letters harmed the employer. At the time of sending the letters, all but one of Local 65 members in the plant had been fired. The discharged employees had, up to that time, attempted unsuccessfully to reinstate themselves by filing charges with the Board. Now they joined with Penchansky in sending out letters publicizing their cause. True, in these letters, they additionally asked that "the employer agree to sit down to negotiate a contract" and "that the firm negotiate in good faith with the Union of our own choice." But in the letters, the statement of this purpose comes after the statement about the discharges and can be read as indicating that the contract was only a means to that end. The letters obviously were written by novices in the field of labor relations, as appears from the reference to a "lock-out" by employees. It is not difficult to conclude that the letters were a poorly-worded attempt by the writers to obtain a redress of the writers' own grievances, i. e., reinstatement. And it is very far from clear, on the evidence now before us, that the workers, by a strike or otherwise, would have pursued the aim

of an exclusive bargaining contract if they had attained reinstatement. For they had previously agreed to suspend any such exclusive recognition claim pending the Teamsters' election, and, before their members' discharge, had said or done nothing to suggest a lack of intention to live up to that promise. As the Board noted, it is not certain that the letters demanded an exclusive bargaining contract for Local 65 at all. The writers might have had in mind something like a members-only contract to insure satisfactory reinstatement and working conditions for themselves alone, or they might have been satisfied by mere reinstatement without a contract.

■ Considering the actualities of the collective bargaining and grievance procedures, we think the employer must realize that far-fetched and overstated claims, easily dissuadable, are often made initially by one side in a labor dispute (especially when it is inexperienced in labor relations). Such claims may well evaporate on discussion and negotiation, and never become an integral part of the union's real purposes. We think that the employer cannot seize upon this kind of claim—made by ignorant workers in their initial demands—in order to justify retaliatory measures against them. He must make some effort to find out if the employees mean in fact to pursue these claims, to stick to demands which are not protected by § 7. Summary discharge seems especially premature here.

■ Nor, indeed, has the Board or the trial examiner given us any clear finding of fact that the employees intended seriously to pursue an exclusive bargaining contract for Local 65. Picketing did not in fact begin until after Penchansky's discharge on July 13. Apparently it lasted through sometime in August. A settlement of the discharged employees' complaints to the Board was entered into on July 22, but the employees were not immediately reinstated by that agreement. The reason for picketing after July 22 is not apparent. Consequently before calling the sending of the letters unprotected, because conducted for an illegal purpose, we will remand the case to the Board for the taking of additional evidence and the making of a finding of fact on the question of whether, in the context in which they were written, the letters showed that the employees intended in fact to pursue the aim of an exclusive-bargaining contract.

Enforcement denied and case remanded.

CLARK, Circuit Judge (dissenting).

Judge FRANK'S initially fine statement of the law seems to me to run down to an inconclusive end. I am opposed in principle to any course which serves to drag out litigation essentially determined for the satisfying of procedural niceties. This case seems to me of this sort. For the Board found explicitly that the statements in the letters were no more than "campaign propaganda" within "the proper bounds of concerted activity" and hence "that Penchansky's discharge because of his part in this concerted activity constituted a violation of Section 8(a) (1) and (3) of the Act." Whatever the Board is supposed to do on this remand, I should think that this clear statement shows what its ultimate conclusion must be and is.

But if I understand what the remand is to ascertain, I think it based on a misreading of the record. The settlement of July 22, 1949, was of an earlier case, on a charge dated May 24, 1949, of one Melnick for the firing of himself and another employee, Cohen, on May 23. It did not involve the discharge of Penchansky, whose charge (as the Board carefully points out) was filed on the very day of the prior-case settlement, July 22. The letters were written on July 8 and 12, while the picketing, according to Penchansky, took place "the week after July 13" or after his discharge. Later he did say he participated in a picket line in August without defining it further or showing whether it was a renewal or some new development. In any event I fail to see how this circumstance may be used to put a construction upon the letters which they had not borne earlier. It would seem natural that the union might resume the justified course of protesting Penchansky's discharge, which had not been redressed and which led eventually to the issuance of the Board's complaint. But in fact the picketing could have been proper

for a variety of reasons so long as they fell short of the reason the Board refused to find, to wit, attempted compulsion of union recognition during the pendency of representation proceedings. I do not see how a remand can change any of this or show the letters now to be different from what the Board has found them to be. So a remand for a recharacterization of the letters would seem unnecessary and hence undesirable in any event. Moreover, the mandate to the Board seems to me particularly confusing and ambiguous in its directive. What does the "context" mean beyond just what the Board has been considering? And "the letters showed" to whom? To the employer subjectively? Surely that is not a proper construction, but that seems all that is left to be considered. I hope the Board can see its way more clearly than I.

All this confusion to be now continued for months or perhaps years cannot make for settled or smooth labor relations in this plant. In my judgment an enforcement order should issue at once.