**BOEING AIRPLANE COMPANY, a corporation, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 14540.**

United States Court of Appeals Ninth Circuit.

June 18, 1956.

Holman, Mickelwait, Marion, Black & Perkins, DeForest Perkins, William M. Holman, Robert S. Mucklestone, Seattle, Wash., for appellant.

Houghton, Cluck, Coughlin & Henry, Seattle, Wash., amici curiae.

Theophil C. Kamholz, Gen. Counsel, David P. Findling, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Dominick L. Manoli, Frederick U. Reel, Nancy M. Sherman, Attys., National Labor Relations Board, Washington, D. C., for respondent.

Before STEPHENS, ORR and FEE, Circuit Judges.

### JAMES ALGER FEE, Circuit Judge.

A petition has been filed by Boeing Airplane Company to review and set aside an order of the National Labor Relations Board.[1] The sole question presented is whether Boeing violated the Act on January 27, 1953, by then discharging from its employ one Charles Robert Pearson.

Complaint was issued charging several violations by Boeing. An exhaustive hearing was held. The Trial Examiner issued a thorough analysis of the facts and applicable law, and recommended a dismissal of the complaint in its entirety. Specifically, he found the discharge of Pearson was based upon the fact that Pearson, while employed and not on strike, was acting as an employment agent to procure offers from other employers for Boeing engineers; that Pearson refused on request to give up these activities or to terminate his employment with Boeing. The effect of the findings of the Trial Examiner was that the ground of discharge was true in fact; that Boeing acted in good faith and with the firm and well founded belief that the actions of Pearson were inimical to the vital interests of Boeing and constituted disloyalty.

The Board, in review, pursuant to the recommendation of the Trial Examiner, unanimously dismissed all of the other contended violations set up in the complaint, namely: (1) that Boeing had refused to bargain in good faith in connection with the discharge of Pearson; and (2) that it had refused to bargain in good faith in connection with a unilateral salary increase.

Two of the members of the Board agreed with the Trial Examiner that the discharge of Pearson under the circumstances constituted no violation of the Act. Since these two were in a minority, they dissented.

The three members of the Board held the discharge was a violation of Sections 8(a) (3) and 8(a) (1) of the Act[2] and entered the usual elaborate order reciting the delinquencies in the statutory language and branding Boeing as a violator. The conclusion of violation was based upon the discharge alone. The majority do not controvert the acts of Pearson which lead thereto. The acts of Boeing, its intent and motives and the vital interests which its officers sought to protect are conceded even by the majority of the Board. They say that the discharge of Pearson "resulted from the good faith but mistaken belief of its [Boeing's] rights under the Act." Review is asked, therefore, only in respect to the holding of the majority as to the illegality of the discharge. Since the facts are not controverted in any matter of moment, only a question of law is presented.

The immediate facts which brought about the discharge of Pearson and the subsequent happenings in relation thereto are now set out.

Some time in the end of January, 1953, there was brought to the attention of A.

---

1. See 110 N.L.R.B. 147.

2. 29 U.S.C.A. § 158 (a) (3), (a) (1).

F. Logan, an officer of Boeing in charge of industrial relations, a copy of a letter as follows:

"[Letterhead of Seattle Professional Engineering Employees Association]

"Are you in Need of Additional Engineers?

"The Seattle Professional Engineering Employees Association, with a membership of 2,300, invites your Company to participate in a Manpower Availability Conference to be held in Seattle about March 9th, 1953. The purpose of the Conference is to put employers of engineers in contact with those of our members who are available for new positions.

"Over 500 engineers, scientists and industrial mathematicians are pledged to attend the Conference. Represented in this group are men of assorted lengths of experience and types of training as is portrayed by the attached graphs. A distinction between men who are actively seeking new connections and those whose interest is more dependent upon the advantages of other situations will be noted in the make-up of the graphs.

"These engineers are looking for more than a change of scenery. They are employed engineers who feel they would be capable of greater accomplishment in positions where engineering talents are directed more specifically to engineering work and where credit for individual effort and recognition of engineering excellence are more general. They seek a working climate where their training and ability will be more fully utilized and in which compensation is in proportion to talent and productiveness.

"In order to provide a better understanding of the type of conference which is contemplated, a general outline of its operation might be of interest. It is planned that the Conference will be conducted in two separate phases.

"The first phase will provide the means of quickly and efficiently arranging interviews between the five hundred engineers and the participating companies. This will be accomplished by conducting exposition-like meetings on as many consecutive evenings as appears necessary. At this time, the engineers, perhaps accompanied by their wives, will visit the various booths, which are to be provided for each of the participating companies.

"The representatives of each company will here have the opportunity to address groups of engineers, to explain the company's needs and the advantages of employment with it, and to distribute descriptive literature and application blanks to those who are interested. Secretaries at a centrally located Association booth will then make appointments for private interviews.

"Providing an opportunity for the participating companies to show a limited number of motion pictures is under consideration. The Association will provide ditto and mimeograph facilities for any duplicating the company representatives may require. An augmented Association secretarial staff will also be at their disposal.

"The second phase of the Conference will consist of individual private interviews. These interviews may be conducted in the hotel rooms of the company representatives or, if it is desired, the Association will provide other suitable facilities.

"Inasmuch as these engineers are seeking particular situations wherein their experience and capabilities are most fully utilized, it is recommended that the participating companies send engineering representatives who can accurately present detailed job requirements and de-

scribe the conditions of employment on the company's engineering staff. These representatives should come prepared to make firm offers when they interview engineers meeting their requirements.

"It is planned that the Conference will be self-liquidating. For this reason, each company will be asked to pay a registration fee of $25 and an additional fee of $10 for each engineer hired as a direct result of the Conference. These fees may be rebated on a pro rata basis if the costs of the Conference are appreciably less than the fees collected. Each engineer who accepts a position as a result of the Conference will be charged a fee of $15.

"To insure adequate preparation for the Manpower Availability Conference, commitments to attend will be accepted until February 6, 1953. Answers to the questions appended to this invitation will aid the Association in its planning for the Conference. Receipt of acceptances of this invitation will be acknowledged in a subsequent letter which will announce the date and supply additional details.

"Yours very truly,
"/s/ Chas. Robt. Pearson,
"Director Manpower Availability Service (Licensed and Bonded Employment Agent)

"How many engineers do you need?

"How many representatives will you send?

"Would you like for the Association to make your hotel reservations? What accommodations are desired?

"What special facilities would you wish the Association to supply? Please note that individual sound amplification systems will not be permitted."

About the same time, Boeing was notified that the SPEEA, the union to which Pearson belonged, was encouraging the plan, but with specific limitations. The letter of the Chairman of the Executive Committee set these out as follows:

"In offering this service to its members, SPEEA has retained an agency for bringing together those engineers and companies who may care to discuss employment possibilities. SPEEA offers no special inducement to engineers to terminate, nor does it enter in any way into negotiations between the companies and the engineers."

When these matters were thus brought to his attention, A. F. Logan had no personal knowledge of the fact that Pearson was a Boeing employee. When this was learned, Logan asked that Pearson return from an assignment in Los Angeles so that Logan could talk to him. During this ensuing conversation, Pearson admitted he had signed the letter of invitation set out above as the "Licensed and Bonded Employment Agent." Thereafter, Pearson refused to answer whether he was so licensed and bonded and as to whether he would abandon activities as such an employment agent or, in the alternative, give up his employment with Boeing. Pearson stated only that the union representatives must be present before the matter could be discussed, and read a statement that, since the action of Boeing was timed to meet the invitations for the employment conference, it was retaliatory action against the union "and against me personally and retaliation against my legitimate union activities." Boeing insisted that the activities of the union and Pearson's own connection with the union had nothing to do with his position as an employment agent.

The position of Boeing was clearly set out. It was stated on the assumption that Pearson was a licensed and bonded employment agent attempting to secure outside positions for employees of Boeing and that the work of Pearson as an employee of Boeing "would be entirely

too greatly impaired by your outside activities as an employment agent and we are therefore unwilling to permit you to continue such activities and remain in our employ."

Thereafter, since no notice was given to Boeing that Pearson made any choice in the matter, steps were taken to terminate his employment. Termination of his tenure was formally made by Boeing.

Subsequently, Boeing discovered that the elaborate scheme, as evidenced by the letter quoted above, had not worked and was abandoned by the union. During all of this period, there was no contract between SPEEA, the union, since the previous agreement had expired. After the discharge of Pearson, there were various negotiations with the union, including among others the question of reemployment of the discharged employee. When the union stated to Boeing that it "would recommend rejection of *any* offer made by the Boeing Airplane Company until such time as * * * Pearson is reinstated unequivocally," the Company acquiesced.

Pearson was reinstated by Boeing to his former position without prejudice and with all the rights and privileges acquired by him prior to his termination. This action was taken by Boeing apparently to remove the matter so that it would not hinder negotiations. But another factor may have been considered. Pearson, after his discharge, had been employed by the union and had suffered no loss of income during the interim. He had in fact continued as Chairman of the so-called "Manpower Availability Conference." But the conference was never held because of the fact that only eighteen replies had been received to the letter set out above signed by Pearson as a licensed and bonded employment agent. The discharge of Pearson had nothing to do with the failure. The conference fell of its own weight. When the question of reinstatement came up, it was obvious that Pearson was not, when restored, to spend the time for which Boeing paid him in the activities of a licensed and bonded employment agent facilitating other engineers employed by Boeing in obtaining jobs with competitors.

The harm Boeing anticipated is clearly set out in the record and the testimony, and the Trial Examiner found:

"Vice President Logan testified without contradiction, and I find, that the Respondent's backlog of business at its Seattle Division currently stands at almost an even billion dollars. It involves orders, primarily placed by the United States Air Force, for items vital to our national defense: heavy bombers, guided missiles, gas turbines, and various classified research and experimental projects. All of the Respondent's projects appear to be technical—some highly so—and impossible of completion in the absence of an adequate engineering staff. Logan estimated that if a substantial number of the firm's engineers had resigned at the same time, or within a short period, the Respondent would have had to suspend one project after another as long as the exodus continued; he expressed the opinion—without contradiction—that the firm would have lost 'millions of dollars' worth of business through the forced abandonment of current projects or their cancellation by the Air Force, and that it might have taken the Respondent several years to recover from such a blow, at a cost to it of unnumbered millions of dollars. The Vice President's estimates and opinion have not been challenged as unreasonable."

Yet Boeing did not demand that the conference be called off or abandoned or that Pearson cease to act in the matter as chairman of the group. As a matter of fact, neither was done. Boeing demanded that he cease his activities as bonded and licensed agent or that he resign from their employ. This principle has been clearly announced:

"He can not collect wages for his employment, and, at the same time,

23

engage in activities to injure or destroy his employer's business." Hoover Company v. National Labor Relations Board, 6 Cir., 191 F.2d 380, 389.

It seems clear that Boeing had made out its affirmative case. It was within its prerogative, as the Trial Examiner found, to discharge Pearson for disloyalty in thus acting against the essential interests of his employer and refusing to abstain when given the opportunity.

The only question, therefore, upon which the Board passed or could pass was the intent of Boeing in the discharge of Pearson. The Company had the right of discharge if adequate cause existed, and the provisions of the Act were not violated. There is no question of fact involved. It is conceded that Boeing acted in good faith and for the reasons which were alleged by the Company. This is differentiated from the case where questions of fact are raised and there are diverse findings by the Trial Examiner and the Board.

The basis of discharge was the unwillingness of Pearson to give up his activities as a licensed and bonded employment agent whereby he would consummate reemployment by competitors of Boeing of its own regularly employed engineers. Unless ordinary ethical concepts have been entirely obliterated, his enterprise was, upon its face, indefensible and disloyal. It has always been thought unethical for one business firm to attempt to seduce by underhand methods employees of another to leave their jobs. But here an employee of Boeing was offering himself as the agent of competitors to accomplish that very object. This refusal to desist seems also illegal even if done in concert. It falls in the classification of a slow-down, sit-down strike, wildcat strike, damage to business or to plant and equipment, trespass, violence, refusal to accept work assignment, physical sabotage, refusal to obey rules and other such activities.

But here it must be remembered that the ground upon which Boeing acted in the discharge was not the concerted activity involved, but the individual unwillingness of Pearson to refrain from activities as a licensed agent.

But it is said there are broader issues inasmuch as the activity was a concerted one. Full scope must be given to "concerted activities for the purpose of collective bargaining or other mutual aid or protection." Section 7 of the Act. But all concerted activities are not thereby legal, as we have seen above. If the acts of Pearson, for which Boeing discharged him, are to be judged, not as his individual conduct (as we think it should be), but as part of a concerted activity, still the whole combination to destroy or damage the business of the employer would seem collectively disloyal and illegal.

A case which is not involved with union activities, but does deal with the legality of concerted action by employees, may furnish an analogy. The officers of an advertising agency united and threatened to leave as a group. When their demands were not met, they left and set up as competitors, taking many employees of their employer and many important clients whom they had solicited before they left. For this they were held liable to the employer in damages. Duane Jones, Co., Inc., v. Burke, 306 N.Y. 172, 117 N.E.2d 237. We may agree this case is not applicable here, but it is certainly illustrative of the ethics involved.

Here the union could have struck. The group could have agreed to quit. But it was illegal to enter into a concerted effort to employ one of the employees of Boeing as a licensed and bonded employment agent to make agreements for all or part of such employees to hire out to one or more of the competitors of the latter before Pearson or the others quit.

The majority of the Board seemed to think this was an activity which the union had a right to carry on. There had been a breakdown in the negotiations between Boeing and SPEEA for a new contract. The Manpower Availability Conference was authorized by the union as a

means of bringing economic pressure on Boeing after the deadlock in negotiations, and Pearson was designated by the group as Chairman and instructed to obtain a license and bond as an employment agent. It is claimed this was comparable to operating a hiring hall. However, that has no pertinency. The union expressly disassociated itself from negotiations for hiring away Boeing employees in the letter set out above. Much more to the point, the union in this letter placed the full responsibility for such negotiations on Pearson, as the licensed agent. The request of Boeing that Pearson resign as agent can scarcely be treated as interference with union activity.

But the majority of the Board, notwithstanding that the discharge of Pearson was upon the sole basis of disloyal activity personally, insisted on finding in face of the dissent and the findings of the Trial Examiner, that as a matter of law the termination was in violation of two different sections of the Act. It seems such a result, after the whole controversy had settled down, was establishing the principle that outright personal disloyalty is to be encouraged and that thereby the flames of labor unrest are to be fanned rather than allayed.

First, the majority of the Board concluded that the discharge was by way of "discrimination in regard to * * * tenure of employment * * * to * * discourage membership in any labor organization." Section 8(a) (3). This conclusion is contrary to the facts in the record and found by the Trial Examiner. Boeing at all times extended the fullest cooperation. It did not attempt to undermine the membership in the bargaining unit. It continued earnestly negotiating with the representatives of SPEEA. It even reinstated Pearson on the demand of the union and without conditions. Boeing was certainly not discriminating against Pearson. It simply required him to give up activities which Boeing considered subversive of its vital business interests.

Finally, the majority of the Board held that the discharge of Pearson by Boeing was unfair, since the act tended "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed" by Section 7 of the Act. This conclusion has already been dealt with during the consideration of the act of Pearson which caused discharge. The majority held that the Manpower Availability Conference was designed to give mutual aid or protection by securing other employment for union members who desired to change employment and for the purposes of collective bargaining to strengthen the hand of the union in negotiations with Boeing. This disregards the specific disclaimer of the union of engaging in negotiations and its designation of a licensed agent. It disregards the fact that Pearson was acting as an independent agency and refused to desist at the demand of Boeing. It disregards the right of Boeing to discharge him for the illegal activity from which the union disassociated itself and which Boeing believed might do irreparable damage to its business.

The Trial Examiner found:

"The record shows that the fears of the Respondent in this respect were not articulated to impress the Board; they were communicated to the Union in connection with the Respondent's attempt to justify its course of conduct with respect to Pearson's termination. I so find. And the record, insofar as I can determine, contains no evidence whatever to warrant an inference that the respondent's fears were illogical or illfounded."

and further:

"In the light of all the considerations herein expressed, therefore, and upon the entire record, I find that the Union's plan to call a Manpower Availability Conference did not involve a protected concerted activity, and that the discharge of Charles Robert Pearson for his activities in connection with the for-

mulation and implementation of the plans for such a conference, was privileged."

Upon this basis, we adopt the language of the dissenting members of the Board, since the intent of the Act is clearly expressed therein:

"We are not here concerned with the legitimacy of the Union's objectives, but rather with the illegitimacy of the means by which the Union sought to achieve those objectives. The Manpower Availability Conference was not a gathering together in concert of employees in order to compel the grant of a bargaining demand by a temporary refusal to work; it was, rather, an employment agency operated under the aegis of the Union for the purpose of causing the permanent severance of the employment relationship. Such activity is the antithesis of the purposes of the Act, which seeks to strengthen the bonds of cooperation between employer and employee. It is equally as disloyal, equally as injurious to the employer's business, and equally as disruptive of industrial peace and stability, as the conduct which was condemned in the above-cited cases.[3] Because it was conceived and utilized for purposes opposed to the purposes of the Act, the activities of the Manpower Availability Conference derive no protection from the guarantee of Section 7 of the Act. The Respondent's discharge of Pearson, because of his participation in such an unprotected activity, was accordingly not unlawful, and we would therefore dismiss the complaint in its entirety."

The petition to set aside the designated portions of the order of the National Labor Relations Board is granted.

**3.** National Labor Relations Board v. Local Union No. 1229, International Brotherhood of Electrical Workers, 346 U.S. 464,

74 S.Ct. 172, 98 L.Ed. 195; Hoover Company v. National Labor Relations Board, 6 Cir., 191 F.2d 380.