## NATIONAL LABOR RELATIONS BOARD v. AINTREE CORPORATION.

### No. 8150.

Circuit Court of Appeals, Seventh Circuit.

April 21, 1943.

Rehearing Denied May 12, 1943.

Robert B. Watts and Jacob Karro, Gen. Counsel, Ernest A. Gross, Associate Gen. Counsel, Howard Lichtenstein, Asst. Gen. Counsel, and Leslie J. Capek, Atty., National Labor Relations Board, all of Washington, D. C., for petitioner.

Hyman G. Stein, of St. Louis, Mo., for respondent.

Before EVANS, MAJOR, and KERNER, Circuit Judges.

EVANS, Circuit Judge.

Petitioner seeks an enforcement of its order of August 12, 1942, which was entered after hearing, upon usual proceedings, under section 10 of the National Labor Relations Act, 29 U.S.C.A. § 160. The alleged unfair labor practice followed shortly upon the Examiner's Report to the National Labor Relations Board, that respondent had violated the N. L. R. Act. For a more particular account of the Board's complaint and ruling in that case, see N. L. R. B. v. Aintree Corporation, 7 Cir., 132 F.2d 469. The instant case was a second proceeding against the same respondent for alleged unfair labor practices, and grew out of the first proceedings. When the N. L. R. B.'s Examiner reported against the employer and the local union, the troublous leaflets were printed and distributed in the plant. This led to respondent's laying off two of the employees for two weeks.

Immediately following the Examiner's Preliminary Report in the first proceeding, trouble, or what promised to provoke militant dissension occurred. Two sewing room employees, Josephine Keagy and Mamie Eichem, brought into the plant a number of copies of a leaflet reading as follows:

"Tune in to 'The Labor Board Decision' Station WEBQ Harrisburg, Illinois, Wednesday, August 27, 7:00—7:30 P. M. What Will Be the Results of the Labor Board Decision? Under the Law What Will the Company Have to Do? How Will It Affect the Company Union? Hear a Complete Discussion of the Labor Board

Decision and the Union. Hear Union Members in Other Towns."

This occurred before the 7 A. M. buzzer signaled the beginning of the day's work. The employee, Eichem, distributed not more than four copies of the leaflet to other employees, while walking to her place of work. Keagy brought in one leaflet. None were distributed after work began.

At 7:15 the production manager summoned all the employees to the front of the room and stated that the factory had been littered with union literature and that the person or persons responsible would be discharged. Shortly thereafter, the two employees, Eichem and Keagy, were summoned to Gilton's office where they found members of the T.B.U. They were interrogated and Keagy replied she had handed out only one leaflet. Eichem said she had distributed two or three. Both asserted they knew of no prohibitory rule. About 9:30, they were again summoned to the office where the production manager told them they were laid off for two weeks as a punishment for having passed out the leaflets.

The formal order which laid them off did not assert that "they had littered the floor," but that they were "causing disturbance on sewing room floor."

A notice had previously been posted by the company which read as follows:

"The charge has been made that certain employees of this company have made statements which are interpreted as reflecting the opinion and policies of this company. This company has been, and will continue to be neutral, and will not take sides in any differences that may exist between different unions and organizations.

"Any employees, regardless of the position they hold, either operator, presser, cutter, forelady, foreman, office help—or any other employee of this company, found guilty of such practice will be instantly dismissed.

"This company has no connections in any way, manner, shape or form with any of the organizations involved in this controversy. We are neutral and we intend to remain so.

"Aintree Corporation,
Irving Flamberg,
President."

At the end of two weeks the two employees were reinstated.

The order here in controversy directed the company

"(1) To cease and desist from:

"(a) Discouraging membership in International Ladies' Garment Workers' Union, Local No. 373, affiliated with the American Federation of Labor, or any other labor organization of its employees, * * *

"(b) * * * interfering with * * * coercing its employees in the exercise of the right to self-organization, * * *

"(2) * * * (a) Make whole Mamie Eichem and Josephine Keagy for any loss of pay they may have suffered by reason of the respondent's discrimination against them by payment to each of them of a sum of money equivalent to the amount she would normally have earned as wages during the 2-week period following August 27, 1941, less her net earnings during said period:

"(b) Immediately post notices * * * and maintain such notices for a period of at least sixty days, * * * stating: (1) that respondent will not engage in the conduct from which it is ordered to cease and desist * * *; (2) that * * * (it) will take the affirmative action set forth (to make whole Mamie Eichem and Josephine Keagy) * * *; and (3) that * * * (its) employees are free to become or remain members of International Ladies' Garment Workers' Union * * * that the respondent will not discriminate against any employee because of membership in or activity on behalf of said labor organization."

A study of the record has convinced us that there is no factual support for the order of the N. L. R. B. The facts are singularly free from dispute. Both sides must base their contentions upon undisputed facts.

That factual story is as follows:

The respondent employs about 250 men and women. Originally there existed one union—a local union—to which most (more than 70%) of the employees belonged. The agents of the A. F. of L. undertook to win over the members. A complaint was made to the N. L. R. B., wherein it was charged that respondent was guilty of unfair labor practices and that it dominated the local union. The Board took jurisdiction and referred the matter to an Examiner who held hearings at which the local union denied any and all domination by the employ-

er, and the employer asserted its complete neutrality as between unions and denied the charges of unfair labor practices. Upon the conclusion of this hearing, the Examiner made and filed his Preliminary Report. He rejected the testimony of the local union members *in toto*, as well as the testimony of the witnesses for the employer. He recommended the A. F. of L. as the bargaining agent. He found the local union was company dominated and the employer guilty of several unfair labor practices.

It was at this hour that the two employees appeared with their above-quoted leaflets. Naturally the leaflets did not "sit well" with the employer, who had insisted throughout the hearing that it was neutral and favored neither of the two unions contesting for the membership of its employees. Nor was it pleasing to the Better Union, which the Board found was company dominated. It was not a happy time for the discussion of unions or union victory or the veracity of witnesses who had testified at the hearings. The time was far more appropriate for "talk about the weather." If the subject, however, had to be "of unions," the victorious representatives of the minority could have well avoided the use of salt when treating the local union's wounds.

The leaflet itself would have been less censurable, in fact it would have been quite unobjectionable, if it had not referred to the local union as the "company union." This was "rubbing it in." Probably no words are more insulting to, or arouse keen resentment more promptly in, an employee than to call him "a scab." The appellation "company union" carried with it the suggestion of company domination, and employees naturally resent such an imputation.

Rather than displaying partiality toward or against either union, the employer's action evidenced neutrality by one whose employees were members of two rival unions engaged in heated litigation. It is fairly inferable that the feeling of hostility between members of the two unions could easily have gotten out of hand. Prompt action by the employer was necessary and action meant discipline. The employees who distributed the leaflets were disciplined.

They were laid off for two weeks, after which they were reinstated. When they returned to work, the heat from this outburst had subsided. The company gave written notice of its desire that all employees should avoid discussion of union membership during working hours. So far as the record shows, its wishes were fully respected.

It was on this fact showing that the Board took action. The sole ground of complaint to or by the Board was the suspension of the two employees. The Board directed that they be reemployed (they had long since been reinstated), and paid the difference between the amount they would have earned during the two weeks' lay off and the amount they actually earned during said time. The usual directions to desist from unfair practices and to post notices were also covered by the order. In so ordering the Board rekindled and spread the fire which had been almost "put out."

Upon this record, which is undisputed, we conclude that the company was justified in disciplining these two employees. We can hardly believe that this leaflet which tauntingly twitted the employer and the members of the Better Union by calling theirs, the "company union" voiced an innocent factual inquiry. The two sentences "Under the Law What Will the Company Have to Do? How Will It Affect the Company Union?" were troublemakers. Calling the Better Union a "company union" made its members see red. It was adding insult to a defeat which was fresh and hurting. It was certain to arouse heated animosities in the breasts of its members. This, we think, was the purpose of the leaflet.

Regardless of whether the company had ever given previous notice about the distribution of circulars, those who provoked this feeling were subject to discipline. Two weeks of suspension of employment followed by reinstatement was a temperate judgment and it furnished no basis or justification for the findings and the order of the Board here in controversy.

The petition of the National Labor Relations Board for enforcement of its order is

Denied.