# NATIONAL LABOR RELATIONS BOARD *v.* LOCAL UNION NO. 1229, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS.

No. 15.   Argued October 12, 1953.—Decided December 7, 1953.

*Dominick L. Manoli* argued the cause for petitioner. With him on the brief were *Acting Solicitor General Stern, Marvin E. Frankel, George J. Bott, David P. Findling* and *Samuel M. Singer.*

*Louis Sherman* argued the cause for respondent. With him on the brief was *Philip R. Collins.*

MR. JUSTICE BURTON delivered the opinion of the Court.

The issue before us is whether the discharge of certain employees by their employer constituted an unfair labor practice, within the meaning of §§ 8 (a)(1) and 7 of the Taft-Hartley Act,[1] justifying their reinstatement by the National Labor Relations Board. For the reason that their discharge was "for cause" within the meaning of § 10 (c) of that Act,[2] we sustain the Board in not requiring their reinstatement.

---

[1] "SEC. 7. Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8 (a)(3).

"SEC. 8. (a) It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 . . . ." National Labor Relations Act, as amended by the Labor Management Relations Act, 1947, 61 Stat. 140, 29 U. S. C. (Supp. V) §§ 157, 158 (a)(1).

[2] "SEC. 10. . . .

.        .        .        .        .

"(c) . . . If upon the preponderance of the testimony taken the Board shall be of the opinion that any person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the Board shall state its findings of fact and shall issue and cause to be served on such person an order requiring such person to cease

In 1949, the Jefferson Standard Broadcasting Company (here called the company) was a North Carolina corporation engaged in interstate commerce. Under a license from the Federal Communications Commission, it operated, at Charlotte, North Carolina, a 50,000-watt radio station, with call letters WBT. It broadcast 10 to 12 hours daily by radio and television. The television service, which it started July 14, 1949, representing an investment of about $500,000, was the only such service in the area. Less than 50% of the station's programs originated in Charlotte. The others were piped in over leased wires, generally from New York, California or Illinois from several different networks. Its annual gross revenue from broadcasting operations exceeded $100,000 but its television enterprise caused it a monthly loss of about $10,000 during the first four months of that operation, including the period here involved. Its rates for television advertising were geared to the number of receiving sets in the area. Local dealers had large inventories of such sets ready to meet anticipated demands.

The company employed 22 technicians. In December 1948, negotiations to settle the terms of their employ-

---

and desist from such unfair labor practice, and to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this Act: *Provided,* That where an order directs reinstatement of an employee, back pay may be required of the employer or labor organization, as the case may be, responsible for the discrimination suffered by him: . . . . If upon the preponderance of the testimony taken the Board shall not be of the opinion that the person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the Board shall state its findings of fact and shall issue an order dismissing the said complaint. *No order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged, or the payment to him of any back pay, if such individual was suspended or discharged for cause. . . .*" (Emphasis supplied in last sentence.) 61 Stat. 146, 147, 29 U. S. C. (Supp. V) § 160 (c).

ment after January 31, 1949, were begun between representatives of the company and of the respondent Local Union No. 1229, International Brotherhood of Electrical Workers, American Federation of Labor (here called the union). The negotiations reached an impasse in January 1949, and the existing contract of employment expired January 31. The technicians, nevertheless, continued to work for the company and their collective-bargaining negotiations were resumed in July,[3] only to break down again July 8. The main point of disagreement arose from the union's demand for the renewal of a provision that all discharges from employment be subject to arbitration and the company's counterproposal that such arbitration be limited to the facts material to each discharge, leaving it to the company to determine whether those facts gave adequate cause for discharge.

July 9, 1949, the union began daily peaceful picketing of the company's station. Placards and handbills on the picket line charged the company with unfairness to its technicians and emphasized the company's refusal to renew the provision for arbitration of discharges. The placards and handbills named the union as the representative of the WBT technicians. The employees did not strike. They confined their respective tours of picketing to their off-duty hours and continued to draw full pay. There was no violence or threat of violence and no one has taken exception to any of the above conduct.

But on August 24, 1949, a new procedure made its appearance. Without warning, several of its technicians

---

[3] Pursuant to proceedings begun in October 1948, and to an election in May 1949, under the supervision of the Board, the union (by a vote of 12 to 2 of the 14 technicians participating) was chosen as the exclusive collective-bargaining representative of the company's technicians. May 9, 1949, the union was so certified by the Board. 94 N. L. R. B. 1507, 1529.

launched a vitriolic attack on the quality of the company's television broadcasts. Five thousand handbills were printed over the designation "WBT TECHNICIANS." These were distributed on the picket line, on the public square two or three blocks from the company's premises, in barber shops, restaurants and busses. Some were mailed to local businessmen. The handbills made no reference to the union, to a labor controversy or to collective bargaining. They read:

### "IS CHARLOTTE A SECOND-CLASS CITY?

"You might think so from the kind of Television programs being presented by the Jefferson Standard Broadcasting Co. over WBTV. Have you seen one of their television programs lately? Did you know that all the programs presented over WBTV are on film and may be from one day to five years old. There are no local programs presented by WBTV. You cannot receive the local baseball games, football games or other local events because WBTV does not have the proper equipment to make these pickups. Cities like New York, Boston, Philadelphia, Washington receive such programs nightly. Why doesn't the Jefferson Standard Broadcasting Company purchase the needed equipment to bring you the same type of programs enjoyed by other leading American cities? Could it be that they consider Charlotte a second-class community and only entitled to the pictures now being presented to them?

### "WBT TECHNICIANS"

This attack continued until September 3, 1949, when the company discharged ten of its technicians, whom it charged with sponsoring or distributing these handbills.

The company's letter discharging them tells its side of the story.[4]

September 4, the union's picketing resumed its original tenor and, September 13, the union filed with the Board a charge that the company, by discharging the above-mentioned ten technicians, had engaged in an unfair labor practice. The General Counsel for the Board filed

---

[4] "Dear Mr. . . . ,

"When you and some of our other technicians commenced early in July to picket against this Company, we felt that your action was very ill-considered. We were paying you a salary of . . . per week, to say nothing of other benefits which you receive as an employee of our Company, such as time-and-a-half pay for all work beyond eight hours in any one day, three weeks vacation each year with full pay, unlimited sick leave with full pay, liberal life insurance and hospitalization, for you and your family, and retirement and pension benefits unexcelled anywhere. Yet when we were unable to agree upon the terms of a contract with your Union, you began to denounce us publicly as 'unfair.'

"And ever since early July while you have been walking up and down the street with placards and literature attacking us, you have continued to hold your job and receive your pay and all the other benefits referred to above.

"Even when you began to put out propaganda which contained many untruths about our Company and great deal of personal abuse and slander, we still continued to treat you exactly as before. For it has been our understanding that under our labor laws, you have a very great latitude in trying to make the public believe that your employer is unfair to you.

"Now, however, you have turned from trying to persuade the public that we are unfair to you and are trying to persuade the public that we give inferior service to them. While we are struggling to expand into and develop a new field, and incidentally losing large sums of money in the process, you are busy trying to turn customers and the public against us in every possible way, even handing out leaflets on the public streets advertising that our operations are 'second-class,' and endeavoring in various ways to hamper and totally destroy our business. Certainly we are not required by law or common sense to keep you in our employment and pay you a

a complaint based on those charges and, after hearing, a trial examiner made detailed findings and a recommendation that all of those discharged be reinstated with back pay.[5] 94 N. L. R. B. 1507, 1527. The Board found that one of the discharged men had neither sponsored nor distributed the "Second-Class City" handbill and ordered his reinstatement with back pay. It then found that the other nine had sponsored or distributed the handbill and held that the company, by discharging them for such conduct, had not engaged in an unfair labor practice. The Board, accordingly, did not order their reinstatement. One member dissented. *Id.,* at 1507 *et seq.* Under § 10 (f) of the Taft-Hartley Act,[6] the union petitioned the Court of Appeals for the District of Columbia Circuit for a review of the Board's order and for such a modification of it as would reinstate all ten of the discharged technicians with back pay. That court remanded the cause to the Board for further consideration and for a finding as to the "unlawfulness" of the conduct of the employees which had led to their dis-

---

substantial salary while you thus do your best to tear down and bankrupt our business.

"You are hereby discharged from our employment. Although there is nothing requiring us to do so, and the circumstances certainly do not call for our doing so, we are enclosing a check payable to your order for two weeks' advance or severance pay.

"Very truly yours,

"Jefferson Standard Broadcasting Company

"By: Charles H. Crutchfield

*"Vice President*

"Enclosure"

[5] Allegations based on the same facts and charging violations of § 8 (a)(3) and (5) of the Tart-Hartley Act do not require discussion here.

[6] 61 Stat. 148–149, 29 U. S. C. (Supp. V) § 160 (f).

charge. 91 U. S. App. D. C. 333, 202 F. 2d 186.[7] We granted certiorari because of the importance of the case in the administration of the Taft-Hartley Act. 345 U. S. 947.

In its essence, the issue is simple. It is whether these employees, whose contracts of employment had expired, were discharged "for cause." They were discharged solely because, at a critical time in the initiation of the company's television service, they sponsored or distributed 5,000 handbills making a sharp, public, disparaging attack upon the quality of the company's product and its business policies, in a manner reasonably calculated to harm the company's reputation and reduce its income. The attack was made by them expressly as "WBT TECHNICIANS." It continued ten days without indication of abatement. The Board found that—

"It [the handbill] occasioned widespread comment in the community, and caused Respondent to apprehend a loss of advertising revenue due to dissatisfaction with its television broadcasting service.

"In short, the employees in this case deliberately undertook to alienate their employer's customers by impugning the technical quality of his product. As

---

[7] The Court of Appeals said:

"Protection under § 7 of the Act . . . is withdrawn only from those concerted activities which contravene either (a) specific provisions or basic policies of the Act or of related federal statutes, or (b) specific rules of other federal or local law that is not incompatible with the Board's governing statute. . . .

.        .        .        .        .

"We think the Board failed to make the finding essential to its conclusion that the concerted activity was unprotected. Sound practice in judicial review of administrative orders precludes this court from determining 'unlawfulness' without a prior consideration and finding by the Board." 91 U. S. App. D. C., at 335, 336, 202 F. 2d, at 188, 189.

the Trial Examiner found, they did not misrepresent, at least wilfully, the facts they cited to support their disparaging report. And their ultimate purpose—to extract a concession from the employer with respect to the terms of their employment—was lawful. That purpose, however, was undisclosed; the employees purported to speak as experts, in the interest of consumers and the public at large. They did not indicate that they sought to secure any benefit for themselves, *as employees,* by casting discredit upon their employer." 94 N. L. R. B., at 1511.

The company's letter shows that it interpreted the handbill as a demonstration of such detrimental· disloyalty as to provide "cause" for its refusal to continue in its employ the perpetrators of the attack. We agree.

Section 10 (c) of the Taft-Hartley Act expressly provides that "No order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged, or the payment to him of any back pay, if such individual was suspended or discharged for cause." [8] There is no more elemental cause for discharge of an employee than disloyalty to his employer. It is equally elemental that the Taft-Hartley Act seeks to strengthen, rather than to weaken, that cooperation, continuity of service and cordial contractual relation between employer and employee that is born of loyalty to their common enterprise.[9]

---

[8] See note 2, *supra.*

[9] The Act's declaration of the policy says:

"SECTION 1. . . .

"(b) Industrial strife which interferes with the normal flow of commerce and with the full production of articles and commodities for commerce, can be avoided or substantially minimized if employers, employees, and labor organizations each recognize under law one

Congress, while safeguarding, in § 7, the right of employees to engage in "concerted activities for the purpose of collective bargaining or other mutual aid or protection," [10] did not weaken the underlying contractual bonds and loyalties of employer and employee. The conference report that led to the enactment of the law said:

"[T]he courts have firmly established the rule that under the existing provisions of section 7 of the National Labor Relations Act, employees are not given any right to engage in unlawful or other improper conduct. . . .

.        .        .        .        .

". . . Furthermore, in section 10 (c) of the amended act, as proposed in the conference agreement, it is specifically provided that no order of the Board shall require the reinstatement of any individual or the payment to him of any back pay if such individual was suspended or discharged for cause, and this, of course, applies with equal force whether or not the acts constituting the cause for

another's legitimate rights in their relations with each other, and above all recognize under law that neither party has any right in its relations with any other to engage in acts or practices which jeopardize the public health, safety, or interest. "It is the purpose and policy of this Act, in order to promote the full flow of commerce, to prescribe the legitimate rights of both employees and employers in their relations affecting commerce, to provide orderly and peaceful procedures for preventing the interference by either with the legitimate rights of the other, to protect the rights of individual employees in their relations with labor organizations whose activities affect commerce, to define and proscribe practices on the part of labor and management which affect commerce and are inimical to the general welfare, and to protect the rights of the public in connection with labor disputes affecting commerce." 61 Stat. 136, 29 U. S. C. (Supp. V) § 141 (b).

[10] See note 1, *supra*.

discharge were committed in connection with a concerted activity." H. R. Rep. No. 510, 80th Cong., 1st Sess. 38–39.

This has been clear since the early days of the Wagner Act.[11] In 1937, Chief Justice Hughes, writing for the Court, said:

"The Act does not interfere with the normal exercise of the right of the employer to select its employees or to discharge them. The employer may not, under cover of that right, intimidate or coerce its employees with respect to their self-organization and representation, and, on the other hand, the Board is not entitled to make its authority a pretext for interference with the right of discharge when that right is exercised for other reasons than such intimidation and coercion." *Labor Board* v. *Jones & Laughlin*, 301 U. S. 1, 45–46. See also, *Labor Board* v. *Fansteel Corp.*, 306 U. S. 240, 252–258; *Auto. Workers* v. *Wisconsin Board*, 336 U. S. 245, 260–263.

Many cases reaching their final disposition in the Courts of Appeals furnish examples emphasizing the importance of enforcing industrial plant discipline and of maintaining loyalty as well as the rights of concerted activities. The courts have refused to reinstate employees discharged for "cause" consisting of insubordination, disobedience or disloyalty. In such cases, it often has been necessary to identify individual employees, somewhat comparable to the nine discharged in this case, and to recognize that their discharges were for causes which were separable from the concerted activities of others whose acts might come within the protection of § 7. It has been equally important to

---

[11] National Labor Relations Act of July 5, 1935, 49 Stat. 449, 29 U. S. C. § 151 *et seq.*

identify employees, comparable to the tenth man in the instant case, who participated in simultaneous concerted activities for the purpose of collective bargaining or other mutual aid or protection but who refrained from joining the others in separable acts of insubordination, disobedience or disloyalty. In the latter instances, this sometimes led to a further inquiry to determine whether their concerted activities were carried on in such a manner as to come within the protection of § 7. See, *e. g.*, *Hoover Co.* v. *Labor Board,* 191 F. 2d 380; *Maryland Drydock Co.* v. *Labor Board,* 183 F. 2d 538; *Albrecht* v. *Labor Board,* 181 F. 2d 652; *Labor Board* v. *Kelco Corp.,* 178 F. 2d 578; *Joanna Cotton Mills Co.* v. *Labor Board,* 176 F. 2d 749; *Labor Board* v. *Reynolds Pen Co.,* 162 F. 2d 680; *Home Beneficial Life Ins. Co.* v. *Labor Board,* 159 F. 2d 280; *Labor Board* v. *Montgomery Ward & Co.,* 157 F. 2d 486; *Labor Board* v. *Draper Corp.,* 145 F. 2d 199; *Labor Board* v. *Aintree Corp.,* 135 F. 2d 395; *United Biscuit Co.* v. *Labor Board,* 128 F. 2d 771; *Labor Board* v. *Condenser Corp.,* 128 F. 2d 67; *Hazel-Atlas Glass Co.* v. *Labor Board,* 127 F. 2d 109; *Conn, Ltd.* v. *Labor Board,* 108 F. 2d 390.

The above cases illustrate the responsibility that falls upon the Board to find the facts material to such decisions. The legal principle that insubordination, disobedience or disloyalty is adequate cause for discharge is plain enough. The difficulty arises in determining whether, in fact, the discharges are made because of such a separable cause or because of some other concerted activities engaged in for the purpose of collective bargaining or other mutual aid or protection which may not be adequate cause for discharge. Cf. *Labor Board* v. *Peter Cailler Kohler Co.,* 130 F. 2d 503.

In the instant case the Board found that the company's discharge of the nine offenders resulted from their sponsoring and distributing the "Second-Class City" handbills

of August 24—September 3, issued in their name as the
"WBT TECHNICIANS." Assuming that there had
been no pending labor controversy, the conduct of the
"WBT TECHNICIANS" from August 24 through September 3 unquestionably would have provided adequate
cause for their disciplinary discharge within the meaning
of § 10 (c). Their attack related itself to no labor practice of the company. It made no reference to wages,
hours or working conditions. The policies attacked were
those of finance and public relations for which management, not technicians, must be responsible. The attack
asked for no public sympathy or support. It was a continuing attack, initiated while off duty, upon the very
interests which the attackers were being paid to conserve
and develop. Nothing could be further from the purpose of the Act than to require an employer to finance
such activities. Nothing would contribute less to the
Act's declared purpose of promoting industrial peace and
stability.[12]

The fortuity of the coexistence of a labor dispute
affords these technicians no substantial defense. While
they were also union men and leaders in the labor controversy, they took pains to separate those categories. In
contrast to their claims on the picket line as to the labor
controversy, their handbill of August 24 omitted all reference to it. The handbill diverted attention from the
labor controversy. It attacked public policies of the company which had no discernible relation to that controversy. The only connection between the handbill and

---

[12] ". . . An employee can not work and strike at the same time.
He can not continue in his employment and openly or secretly refuse
to do his work. He can not collect wages for his employment, and,
at the same time, engage in activities to injure or destroy his employer's business." *Hoover Co.* v. *Labor Board*, 191 F. 2d 380, 389,
and see *Labor Board* v. *Montgomery Ward & Co.*, 157 F. 2d 486, 496;
*United Biscuit Co.* v. *Labor Board*, 128 F. 2d 771.

the labor controversy was an ultimate and undisclosed purpose or motive on the part of some of the sponsors that, by the hoped-for financial pressure, the attack might extract from the company some future concession. A disclosure of that motive might have lost more public support for the employees than it would have gained, for it would have given the handbill more the character of coercion than of collective bargaining. Referring to the attack, the Board said "In our judgment, these tactics, in the circumstances of this case, were hardly less 'indefensible' than acts of physical sabotage." 94 N. L. R. B., at 1511. In any event, the findings of the Board effectively separate the attack from the labor controversy and treat it solely as one made by the company's technical experts upon the quality of the company's product. As such, it was as adequate a cause for the discharge of its sponsors as if the labor controversy had not been pending. The technicians, themselves, so handled their attack as thus to bring their discharge under § 10 (c).

The Board stated "We . . . do not decide whether the disparagement of product involved here would have justified the employer in discharging the employees responsible for it, had it been uttered in the context of a conventional appeal for support of the union in the labor dispute." *Id.,* at 1512, n. 18. This underscored the Board's factual conclusion that the attack of August 24 was not part of an appeal for support in the pending dispute. It was a concerted separable attack purporting to be made in the interest of the public rather than in that of the employees.

We find no occasion to remand this cause to the Board for further specificity of findings. Even if the attack were to be treated, as the Board has not treated it, as a concerted activity wholly or partly within the scope of those mentioned in § 7, the means used by the technicians in conducting the attack have deprived the attackers of

the protection of that section, when read in the light and context of the purpose of the Act.[13]

Accordingly, the order of the Court of Appeals remanding the cause to the National Labor Relations Board is set aside, and the cause is remanded to the Court of Appeals with instructions to dismiss respondent's petition to modify the order of the Board.

*It is so ordered.*

MR. JUSTICE FRANKFURTER, whom MR. JUSTICE BLACK and MR. JUSTICE DOUGLAS join, dissenting.

The issue before us is not whether this Court would have sustained the Board's order in this case had we been charged by Congress, as we could not have been, "with the normal and primary responsibility for granting or denying enforcement of Labor Board orders." *Labor Board* v. *Pittsburgh S. S. Co.*, 340 U. S. 498, 502. The issue is whether we should reverse the Court of Appeals, which is so charged, because that court withheld immediate decision on the Board's order and asked the Board for further light. That court found that the Board em-

---

[13] See *Labor Board* v. *Rockaway News Co.*, 345 U. S. 71 (discharge, for violation of an obligation to make deliveries, even though crossing a picket line, sustained); *Auto. Workers* v. *Wisconsin Board,* 336 U. S. 245, 255–263 (arbitrary unannounced interruptions of work, not protected by § 7); *Southern S. S. Co.* v. *Labor Board,* 316 U. S. 31 (discharge of seamen, for disobedience on shipboard while away from home port, sustained); *Allen-Bradley Local* v. *Wisconsin Board,* 315 U. S. 740 (mass picketing, unprotected); *Hotel Employees' Local* v. *Wisconsin Board,* 315 U. S. 437 (violence, while picketing, unprotected); *Labor Board* v. *Sands Manufacturing Co.,* 306 U. S. 332 (discharge, for repudiation of employee's agreement, sustained); *Labor Board* v. *Fansteel Corp.,* 306 U. S. 240 (discharge, for tortious conduct, violence or sit-down strike, sustained); and see *Associated Press* v. *Labor Board,* 301 U. S. 103, 132; *Labor Board* v. *Jones & Laughlin,* 301 U. S. 1, 45–46. See also, Cox, The Right to Engage in Concerted Activities, 26 Ind. L. J. 319 (1951); Recent Cases, 66 Harv. L. Rev. 1321 (1953).

ployed an improper standard as the basis for its decision. The Board judged the conduct in controversy by finding it "indefensible." The Court of Appeals held that by "giving 'indefensible' a vague content different from 'unlawful,' the Board misconceived the scope of the established rule." 91 U. S. App. D. C. 333, 335, 202 F. 2d 186, 188. Within "unlawful" that court included activities which "contravene . . . basic policies of the Act." The Court of Appeals remanded the case for the Board's judgment whether the conduct of the employees was protected by § 7 under what it deemed "the established rule."

On this central issue—whether the Court of Appeals rightly or wrongly found that the Board applied an improper criterion—this Court is silent. It does not support the Board in using "indefensible" as the legal litmus nor does it reject the Court of Appeals' rejection of that test. This Court presumably does not disagree with the assumption of the Court of Appeals that conduct may be "indefensible" in the colloquial meaning of that loose adjective, and yet be within the protection of § 7.

Instead, the Court, relying on § 10 (c) which permits discharges "for cause," points to the "disloyalty" of the employees and finds sufficient "cause" regardless of whether the handbill was a "concerted activity" within § 7. Section 10 (c) does not speak of discharge "for disloyalty." If Congress had so written that section, it would have overturned much of the law that had been developed by the Board and the courts in the twelve years preceding the Taft-Hartley Act. The legislative history makes clear that Congress had no such purpose but was rather expressing approval of the construction of "concerted activities" adopted by the Board and the courts.[1] Many of the legally recognized tactics and weapons of

---

[1] H. R. Rep. No. 245, 80th Cong., 1st Sess. 27–28; H. R. Rep. No. 510, 80th Cong., 1st Sess. 38–39.

labor would readily be condemned for "disloyalty" were they employed between man and man in friendly personal relations. In this connection it is significant that the ground now taken by the Court, insofar as it is derived from the provision of § 10 (c) relating to discharge "for cause," was not invoked by the Board in justification of its order.

To suggest that all actions which in the absence of a labor controversy might be "cause"—or, to use the words commonly found in labor agreements, "just cause"—for discharge should be unprotected, even when such actions were undertaken as "concerted activities, for the purpose of collective bargaining," is to misconstrue legislation designed to put labor on a fair footing with management. Furthermore, it would disregard the rough and tumble of strikes, in the course of which loose and even reckless language is properly discounted.

"Concerted activities" by employees and dismissal "for cause" by employers are not dissociated legal criteria under the Act. They are like the two halves of a pair of shears. Of course, as the Conference Report on the Taft-Hartley Act said, men on strike may be guilty of conduct "in connection with a concerted activity" which properly constitutes "cause" for dismissal and bars reinstatement.[2] But § 10 (c) does not obviate the necessity for a determination whether the distribution of the handbill here was a legitimate tool in a labor dispute or was so "improper," as the Conference Report put it, as to be denied the protection of § 7 and to constitute a discharge "for cause." It is for the Board, in the first instance, to make these evaluations, and a court of appeals does not travel beyond its proper bounds in asking the Board for greater explicitness in light of the correct legal standards for judgment.

---

[2] H. R. Rep. No. 510, 80th Cong., 1st Sess. 39.

The Board and the courts of appeals will hardly find guidance for future cases from this Court's reversal of the Court of Appeals, beyond that which the specific facts of this case may afford. More than that, to float such imprecise notions as "discipline" and "loyalty" in the context of labor controversies, as the basis of the right to discharge, is to open the door wide to individual judgment by Board members and judges. One may anticipate that the Court's opinion will needlessly stimulate litigation.

Section 7 of course only protects "concerted activities" in the course of promoting legitimate interests of labor. But to treat the offensive handbills here as though they were circulated by the technicians as interloping outsiders to the sustained dispute between them and their employer is a very unreal way of looking at the circumstances of a labor controversy. Certainly there is nothing in the language of the Act or in the legislative history to indicate that only conventional placards and handbills, headed by a trite phrase such as "UNFAIR TO LABOR," are protected. In any event, on a remand the Board could properly be asked to leave no doubt whether the technicians, in distributing the handbills, were, so far as the public could tell, on a frolic of their own or whether this tactic, however unorthodox, was no more unlawful than other union behavior previously found to be entitled to protection.

It follows that the Court of Appeals should not be reversed.