KING, Circuit Judge,
dissenting:
The panel majority has today overruled the Board and denied legal protection to an employee’s one-time use of profane language concerning a supervisor — referring to him as a “stupid fucking moron” — in a private setting during intense labor negotiations. Unfortunately, my colleagues have misconstrued the facts and failed to accord the Board the considerable deference it is *190 due under the law. See NLRB v. Truck Drivers Union, 353 U.S. 87, 96, 77 S.Ct. 643, 1 L.Ed.2d 676 (1957) (“[T]he function of striking [a] balance [between the conflicting interests of employers and employees] to effectuate national labor policy is often a difficult and delicate responsibility which Congress committed primarily to the [Board], subject to limited judicial review.”).[1]
In enforcement proceedings such as this, we are always obliged to defer to the Board “where it has chosen ‘between two fairly conflicting views, even [if we] would justifiably have made a different choice had the matter been before [us] de novo.’ ” Smithfield Packing Co. v. NLRB, 510 F.3d 507, 515 (4th Cir.2007) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951)). We have recognized that the Board’s legal rulings are entitled to deference when they are “rational and consistent” with the Act. NLRB v. Air Contact Transp., Inc., 403 F.3d 206, 210 (4th Cir.2005). Importantly, the Board’s findings on factual issues are conclusive if they are supported by “substantial evidence on the record considered as a whole.” Indus. Turnaround Corp. v. NLRB, 115 F.3d 248, 251 (4th Cir.1997); see also NLRB v. Southland Mfg. Co., 201 F.2d 244, 245 (4th Cir.1952) (recognizing that Board’s legitimately drawn conclusion in discharge proceeding is “binding upon the courts” because courts “are without power to find facts or to substitute their judgment for that of the Board” (internal quotation marks omitted)).
Put simply, the panel majority today has embarked on an unjustifiable reach — making de novo findings and conclusions in this case — and substituted its judgment for a decision reserved by law to the Board. I strongly disagree and therefore dissent.
I.
As an initial matter, the panel majority’s recitation of the relevant facts fails to capture the appropriate picture of the labor negotiations underlying this enforcement proceeding. Thus, the majority fails to place in proper perspective McMillen’s one-time reference to Vice President Barker as a “stupid fucking moron.” When the collective bargaining agreement (“CBA”) between the Tribune and the Union expired on October 31, 2004, the parties began negotiating on a new labor contract. Between December 2004 and November 2005, Barker prepared and distributed a series of letters to the Tribune’s employees, describing the contract negotiations from the company’s point of view. The contents and tone of those communications are crucial to assessing the propriety of McMillen’s single challenged comment, and to deciding whether the Board’s ruling that he could not legally be terminated is entitled to considerable deference:
• Barker’s first letter, dated December 28, 2004, asserted that the negotiations could have been completed in one day at the first bargaining session and blamed the lack of an agreement on the Union representative;
• The second letter, dated June 2, 2005, asserted that, during the negotiations, the Union representative had called Barker a “fucking idiot” and had *191 threatened a strike and boycott. Media Gen. Operations, Inc., No. 12-CA-24770, slip op. at 2, 2007 WL 601571 (N.L.R.B. Feb. 22, 2007) (the “ALJ Decision”). Barker then stated that it appeared the parties would be negotiating for a long time;
• The third letter, dated September 1, 2005, alleged “unprofessional behavior” by the Union during the June meeting, and spoke of “consequences that [the employees] might face as a result of this behavior.” ALJ Decision at 2;
• The fourth letter, dated September 30, 2005, referred to labor negotiations on September 26 and 27, criticizing the Union’s behavior and expressing concern about the slow pace of such negotiations; and
• The fifth letter, dated November 1, 2005, discussed proposed bargaining dates. Barker criticized the Union representative’s lack of availability on certain dates and stated, “We at least hope that, in the future, the Union will respond more promptly.” ALJ Decision at 3.
Not unexpectedly, the Union employees reacted angrily to the letters’ antiunion slant. In response, on November 4, 2005, twenty-five pressroom Union employees prepared their own letter, criticizing Barker and the Tribune’s bargaining posture. The employees’ letter observed that Barker sat in a “nice clean, quiet office, chat[ting] with people in business suits” and “go[ing] out to lunch,” while the Union employees “work in noise so loud we need hearing protection, breath [sic] chemical fumes and ink mist, handle hazardous ... chemicals” and “are not allowed to leave the premises for lunch.” ALJ Decision at 3. The Union employees pointed out that there was no carpet on the floor nor pictures on the walls, and the equipment with which the employees work “can strip the flesh off our bones and mangle us.” Id. Finally, they urged Barker to sign the Union proposal and “help us feel confident our management team is as thankful for our efforts as you say and write.” Id.
Barker’s sixth and final letter, dated November 9, 2005, was written in response to the Union employees’ letter. Barker wrote that he appreciated the employees’ work and realized their frustration, and the Tribune would be “as patient as necessary to get a good [CBA]” and was “going to persevere.” ALJ Decision at 3-4. Barker asserted that third parties interfere with “collective as well as individual successes,” and added that, under the Union structure, the Company could not individually negotiate with employees or a subgroup of employees “as long as [they had] a third party representative.” Id. at 4.
McMillen was by no means a passive observer to the labor negotiations regarding a new CBA. He had received Barker’s first five letters and, on several occasions after receiving and reading them, spoke with his foremen and voiced dissatisfaction with Barker. He also voiced his dismay in conversations with fellow employee Donald Hale, who shared a negative opinion of the letters.[2] Not surprisingly, McMillen was one of the twenty-five Union employees who signed the November 4 letter protesting the Company’s bargaining posture.
On November 10, 2005, while working the evening shift, McMillen first learned from another employee that Barker had sent his final November 9 letter. During a lull at work, he went to the pressroom *192 office and spoke with his shift foremen, Lerro and Bridges. When Bridges asked McMillen how he' was doing, McMillen complained about the slow pace of the labor negotiations and about the letters Barker had been sending. McMillen said, “I am a little stressed out. I heard we got another letter from Bill Barker.” ALJ Decision at 4. McMillen admitted he had not read Barker’s latest letter, but Lerro told him it was probably a response to the employees’ letter. McMillen then opined it was not right for Barker to be “harassing” and “threatening” the workers by sending letters. Id. He added, in reference to Barker, “I hope that [stupid] fucking [moron] doesn’t send me another letter. I’m pretty stressed, and if there is another letter you might not see me. I might be out on stress.” Id.[3] As a result, Lerro sent an email to pressroom manager Kerr the following morning, reporting the incident and describing McMillen as “very upset and literally shaking.” Id. at 5.
After missing work the next day, McMil-len signed a disciplinary record documenting his absence. He continued to voice his displeasure with the labor negotiations by writing on the record,
If [Barker] would quit writing me lieing discrimination, harassing and threatening letters through the U.S. MAIL I wouldn’t have to take sleeping pills to go to sleep. Thank you Tampa Tribune for not caring about are well being.
ALJ Decision at 5 (misspellings in original). McMillen thereafter apologized to foreman Lerro if anything he had said on November 10 was inappropriate, and said “you know Bill gets to me.” Id. at 5. When pressroom manager Kerr spoke to McMillen on November 16, McMillen, without being asked, admitted to the outburst and was immediately terminated from his employment with the Tribune.
This picture — which we are obliged to accept as the relevant factual background of this case — shows that, at the time of McMillen’s comment, intense labor negotiations were ongoing with the Company, and the Union employees were upset about the progress of those negotiations and the letters written by Barker. Assessing McMillen’s comment in that context, the Board ruled that the Tribune had violated the Act by terminating McMillen for making the comment, and it therefore ordered his reinstatement as a Tribune employee. See Media Gen. Operations, Inc., 351 N.L.R.B. No. 96, slip op. at 4-5 (2007) (the “Board Decision”). That ruling should not — under controlling precedent — be disturbed by a reviewing court.
II.
A.
The Supreme Court has long recognized that the Act does not protect all concerted activities. For example, the Act does not protect activities that are unlawful, violent, or in breach of contract. NLRB v. Wash. Aluminum Co., 370 U.S. 9, 17, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962).[4] In the con *193 text of labor negotiations, however, employees are generally entitled to use “accusatory language” that is “stinging and harsh,” or even display “a certain amount of salty language or defiance.” CKS Tool & Eng’g, 332 N.L.R.B. 1578, 1586 (2000); Am. Tel. Co. v. NLRB, 521 F.2d 1159, 1161 (2d Cir.1975). Such broad protection is a reflection of the fact of industrial life that, during labor disputes, “[b]oth labor and management often speak bluntly and recklessly, embellishing their respective positions with imprecatory language.” Linn v. United Plant Guard Workers, 883 U.S. 53, 58, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966); see also Consol. Diesel Co. v. NLRB, 263 F.3d 345, 354 (4th Cir.2001) (recognizing that “[tjhere would be nothing left of [the Act’s] rights if every time employees exercised them in a way that was somehow offensive to someone,” they were subject to the threat of discipline).
Of course, as the panel majority points out, “the Act’s protections are not limitless, ... and where they do not reach, employers cannot be compelled to tolerate language or behavior that undermines workplace discipline.” Ante at 188. The Board recognized as much in its Atlantic Steel Co. decision, laying out four factors to be reviewed and balanced to determine if employee conduct is protected by the Act: “(1) the place of the discussion; (2) the subject matter of the discussion; (3) the nature of the employee’s outburst; and (4) whether the outburst was, in any way, provoked by an employer’s unfair labor practice.” 245 N.L.R.B. 814, 816 (1979).[5]
Here, the Board recognized that McMil-len’s comment constituted a “profane and derogatory” statement, but also recognized that “employees are permitted some leeway for impulsive behavior when engaged in a concerted activity.” Board Decision at 2-3. In applying the Atlantic Steel test, the Board concluded that factors one and two weigh “moderately to strongly” in favor of protection for McMillen’s comment under the Act. Id. at 4. The Board explained, on factor one, that “the discussion occurred in an office, away from any other rank-and-file employees, and thus could not have affected workplace discipline or undermined Barker’s authority.” Id. at 3. With respect to factor two, the Board observed that
the subject matter was McMillen’s criticism of the [Tribune’s] bargaining tactics and positions, as well as Barker’s repeatedly sending employees letters perceived to be one-sided, involving issues that many pressmen had similarly commented on both critically and collectively. McMillen’s expression of his opinion on these topics is a fundamental [right under the Act].

Id.

Although the Board further concluded that factor three of Atlantic Steel should weigh against the Act’s protection, the Board specified that “the nature of McMil-len’s remark weighs only moderately against his retaining the Act’s protection.” Board Decision at 3. In so ruling, the Board relied on several pertinent aspects of this dispute: (1) the McMillen comment *194 was about Barker, but was not directed at him; (2) there were no other confrontational aspects, such as physical conduct or threats; (3) McMillen made his comment only once, promptly and spontaneously apologized for it, and, on his own initiative, sought to explain himself; (4) the comment was not insubordinate in regard to production or work assignments; and (5) the comment did not serve to directly challenge Barker’s managerial authority. See id. Finally, the Board also concluded that Atlantic Steel’s factor four should weigh against the Act’s protection — but only “slightly” so, even less than factor three— because McMillen’s comment was “provoked by Barker’s letters, which were lawful communications.” Id.
In making its ultimate assessment of the McMillen comment under the Atlantic Steel test, the Board closed with the following analysis and conclusion, which we owe considerable deference:
We find that the location and subject matter of MeMillen’s statements, which weigh moderately to strongly in favor of retaining the Act’s protection, more than offset the nature of his outburst and the lack of provocation by unfair labor practices of the [Tribune], which weigh slightly to moderately against protection. Thus, ... we find that McMillen’s statements on November 10 retained the protection of the Act despite his profane and derogatory remark about Barker.
Board Decision at 4 (emphasis added).
The Board — the labor experts to whom we must defer — struck an appropriate balance in this dispute, and its conclusion was both rational and consistent with applicable precedent. Cf., e.g., Felix Indus., Inc., 339 N.L.R.B. 195, 196-97 (2003) (concluding that although “nature of [employee’s] outburst must be given considerable weight towards losing the Act’s protection, this one factor is insufficient to overcome the other [two] factors weighing against” loss of such protection, i.e., that outburst occurred during discussion of employee’s CBA rights and in response to employer’s provocative and hostile remarks about employee’s protected activity). Indeed, McMillen’s comment is readily distinguishable from those more egregious cases where an employee might lose the protection of the Act. For example, the Board’s precedent shows that an employee should only lose the Act’s protection in serious situations, such as threatening in-your-face confrontations, or occurrences in working areas with other employees present, thereby disrupting the work environment. See Waste Mgmt. of Ariz., 345 N.L.R.B. 1339, 1340, 1353-54 (2005) (finding no protection under Act, even though discussion concerned possible unfair wage alterations, where employee engaged in unprovoked tirade, cursed repeatedly and loudly before witnesses, refused supervisor’s request to move discussion into office, and made threats toward supervisor); Daimler-Chrysler Corp., 344 N.L.R.B. 1324, 1328-30 (2005) (finding no protection, though discussion concerned scheduling of grievance meeting, where employee cursed repeatedly in front of many other employees, called supervisor “asshole” to his face, physically approached supervisor in “intimidating” manner, and was not provoked by any unlawful conduct on part of employer); N. Am. Refractories Co., 331 N.L.R.B. 1640, 1642-43 (2000) (finding no protection, though employee was engaged in protected activity, where employee angrily approached supervisor and called him “stupid mother fucker” in front of ten other employees).
B.
Notwithstanding the deference that we are mandated to afford the Board, the panel majority “find[s] that the Board *195 erred as a matter of law” in concluding that the Act protects McMillen’s comment, “which was directed to his supervisors, during work hours and in the work place, in a conversation McMillen initiated regarding an undisputedly accurate and legal letter he had admittedly never read,” and which was made in a “setting ... physically and temporally removed from the site of the ongoing collective bargaining negotiations.” Ante at 183. In so ruling, the majority improperly substitutes its judgment for that of the Board on the assessment and balancing of at least three of the four Atlantic Steel factors, and it disregards facts relied on by the Board in favor of its own de novo findings.[6]
1.
Even accepting the panel majority’s version of the facts, its conclusion that the Board misapplied the Atlantic Steel test cannot withstand the slightest scrutiny. First of all, the majority explicitly rejects the Board’s assessment of Atlantic Steel’s factor four — whether McMillen’s comment was, in any way, provoked by the Tribune’s unfair labor practice — which the Board deemed to weigh against the Act’s protection (albeit only “slightly” so), because McMillen’s comment was “provoked by Barker’s letters, which were lawful communications.” Board Decision at 3. The majority concludes that, because “McMillen made his derogatory remark in response to a series of lawful letters sent by his employer,” the Board should have weighed factor four “more than slightly against extending the Act’s protection.” Ante at 188. The majority cites no apposite authority, however, for its conclusion that employee conduct in response to legal employer activity must weigh “more than slightly” against protection. Rather, the majority invokes inapposite Board decisions weighing factor four in favor of the Act’s protection because the employee conduct in question was provoked by illegal employer activity. Significantly, the majority ignores precedent reflecting that, even where the employee responded to legal employer activity, the Board can indeed account for the nature of the employer activity in assessing factor four. Cf. Overnite Transp. Co., 343 N.L.R.B. 1431, 1437-38 (2004) (concluding that factor four weighed in favor of Act’s protection where employer’s “hostile refusal” to discuss circumstances of employee discharges, although potentially lawful, provoked employee conduct); Felix Indus., 339 N.L.R.B. at 196-97 (weighing factor four in favor of protection where employer’s “extremely hostile remarks” about employee’s protected activities, though not alleged *196 to be unfair labor practice, provoked employee conduct).[7]
With further respect to Atlantic Steel’s factor four, the panel majority asserts a “lack of concurrence between Barker’s lawful letter and McMillen’s comment,” deeming the comment to be “an ad homi-nem attack” — in contrast to “a spontaneous outburst” — “temporally removed from the site of the ongoing collective bargaining negotiations.” Ante at 182-83, 187-88. The majority also emphasizes that McMil-len did not read Barker’s final letter, and concludes that this fact “further divorces his derogatory remark from the context of the ongoing labor dispute.” Id. at 188. In concluding that this factual scenario “makes the remark of a nature less eligible for protection,” the majority relies on a wholly distinguishable Board decision: Trus Joist MacMillan, 341 N.L.R.B. 369, 371-72 (2004) (concluding that, although employee’s outburst was provoked by unfair labor practice, factor four did not favor Act’s protection because employee “deliberately launched into a vituperative personal attack” during “confrontational, face-to-face meeting” orchestrated by him three days after employer’s illegal activity). Ante at 187-88. In any event, even if factor four is given greater weight against protection than the “slight[ ]” weight deemed appropriate by the Board, McMil-len is yet entitled to protection from termination, on the basis of the Board’s assessment of the other three Atlantic Steel factors — by which it weighed factors one and two “moderately to strongly” in favor of the Act’s protection, and factor three “moderately” against such protection. Board Decision at 3-4.
Of course, the panel majority also seems to reject the Board’s analysis of at least two other Atlantic Steel factors (factors one and three). The majority’s analysis of these factors, however, is just as problematic and unconvincing as its assessment of factor four. For example, the majority suggests that factor one, i.e., the place of the discussion, should weigh against the Act’s protection because McMillen’s comment was made in a “setting ... physically ... removed from the site of the ongoing collective bargaining negotiations.” Ante at 182-83; see also id. at 189 (criticizing Board Decision for “expand[ing] the Atlantic Steel factors to essentially create a buffer around employee conduct that would travel with the employee wherever he goes”). The majority thereby indicates that, although it was permissible for Barker to send his letters to the union employees’ homes, the employees were not entitled to discuss those letters outside formal CBA negotiations. The majority’s apparent view — that only employee conduct occurring at the physical site of labor negotiations should be accorded protection — is not only grossly unfair, but also completely at odds with precedent. That is, the typical factor one assessment focuses on whether the employee conduct, because of the place where it occurred, somehow un *197 dermined workplace discipline. See, e.g., DaimlerChrysler, 344 N.L.R.B. at 1329 (concluding that factor one weighed against protection in light of place where outburst occurred, in that employee’s “sustained profanity would reasonably tend to affect workplace discipline by undermining the authority of the supervisor subject to his vituperative attack”). Here, the majority does not — and cannot — identify anything in this record supportive of the notion that McMillen’s comment undermined workplace discipline. To the contrary, Lerro’s email to pressroom manager Kerr reporting McMillen’s comment did not even recommend disciplinary action against McMillen; he sent the email because he thought it was proper “to let [Kerr] know of any incidents that happen.” Board Decision at 2. Significantly, McMil-len’s comment was a “private remark,” id. at 3, made to men with whom he frequently spoke about the letters and the labor negotiations. Cf. Stanford N.Y., 344 N.L.R.B. 558, 558 (2005) (“The relatively secluded room and [the employee’s] efforts to maintain the privacy of the conversation minimized the potential that [the employee’s] outburst would impair [the employer’s] ability to maintain discipline in the workplace.”).[8]
The panel majority further suggests that factor three — the nature of the employee’s outburst — should be given more than the “moderate[ ]” weight against protection assigned to it by the Board. Board Decision at 3. More specifically, the majority invokes the Board’s decision in Care Initiatives, Inc., which observed that “insulting, obscene personal attacks by an employee against a supervisor need not be tolerated,” even where such attacks were made during protected activity. 321 N.L.R.B. 144, 151 (1996) (internal quotation marks and alterations omitted). The Care Initiatives decision emphasized, however, that “care must be exercised in evaluating employee language uttered in the course of engaging in activity protected by ... the Act,” and that an employee’s exercise of rights under the Act “must not be stifled by the threat of liability for the over enthusiastic use of rhetoric.” Id. (internal quotation marks omitted). Strikingly, the Board observed in Care Initiatives that “it has been held that calling an employer’s president a ‘son-of-a-bitch’ was not ‘so outrageous as to justify discharge.’ ” Id. at 152 (quoting NLRB v. Cement Transp., Inc., 490 F.2d 1024, 1029-30 (6th Cir.1974)). In light of this and other precedent, it was entirely rational and consistent with the Act for the Board to rule that McMillen’s comment should weigh only moderately against the Act’s protection. Indeed, McMillen’s comment was less like outbursts that have been denied protection, see, e.g., DaimlerChrysler, 344 N.L.R.B. at 1328-29 (concluding that factor three weighed against protection for employee who, in intimidating manner, called supervisor “asshole” to his face and used other profanity, in “more than a single spontaneous outburst,” including “bullshit” and “fuck this shit”), and more like outbursts that have been deemed not to weigh against protection at all, see, e.g., Alcoa, Inc., 352 N.L.R.B. No. 141, 2008 WL 4056272 (N.L.R.B. Aug. 29, 2008) (concluding that factor three did not weigh against protection for employee who referred to supervisor, across meeting table, *198 as “egotistical fucker,” because employee’s “conduct consisted of a single verbal outburst of profane language” that “was simply a forceful and momentary expression of his frustration”).
In these circumstances, the Board has neither expanded the Atlantic Steel factors nor the “parameters of our extant law,” as the panel majority contends. Ante at 189. The Board’s disposition of this dispute was well within the parameters of its legal authority and binding precedent, and it is instead the panel majority that has reached beyond its bounds.
2.
Finally, the panel majority asserts that it has not made any de novo findings in overruling the Board decision, and that it has accorded appropriate deference to the Board’s findings on the underlying facts. To the contrary, multiple findings of the majority were neither made nor contemplated by the Board, and many of the majority’s findings flagrantly contradict those of the Board. For example:
• According to the majority, there was a “lack of concurrence” between Barker’s final letter and McMillen’s comment. Ante at 188. To the contrary, the Board found that McMillen’s comment was “directly motivated” by Barker’s final letter and a “logical outgrowth” of McMillen’s membership in “the group of employees protesting Barker’s letters and the positions expressed in them.” Board Decision at 2.
• According to the majority, that McMil-len had not read Barker’s final letter before he made the comment “further divorces his derogatory remark from the context of the ongoing labor dispute.” Ante at 188. To the contrary, the Board directly addressed this point and found that the fact that McMillen had not read the letter when he made his comment “does not prevent us from concluding that McMil-len’s criticism of this letter was concerted activity,” especially in view of the fact that McMillen’s comment came in response to foreman Lerro’s remark about the likely content of the letter. Board Decision at 2 n. 9.
• According to the majority, McMillen’s comment was “temporally removed from the site of the ongoing collective bargaining negotiations.” Ante at 183. To the contrary, the Board found that McMillen’s conversation with foremen Lerro and Bridges, when the comment was made, “was part of an ongoing collective dialogue between Barker and the unit employees about the substance and process of the contract negotiations.” Board Decision at 2; see also ALJ Decision at 13 (“McMillen was raising issues with Lerro and Bridges that were shared by the Union and his co-workers — their resentment toward Barker’s letters about the negotiations, as well as the slow progress of the negotiations.”).
• According to the majority, McMillen launched an “ad hominem attack” against Barker. Ante at 188. Although the Board recognized McMil-len’s comment as “intemperate,” “profane,” and “derogatory,” it never suggested that he made the comment to launch a personal attack on Barker. Board Decision at 2, 3. Rather, the Board characterized McMillen’s comment as an “ill-tempered rejoinder! ]” to Barker’s positions on the contract negotiations and his choice to air those views in his letters to the employees. Id. at 4.
In the context of all this, I am reminded of our founding father John Adams, who sue- *199 cessfully argued on behalf of the British soldiers charged in the Boston Massacre more than two centuries ago. President-to-be Adams emphasized the time-honored proposition that “[f]acts are stubborn things ... and whatever may be our wishes, our inclinations, or the dictates of our passions, they cannot alter the state of facts and evidence.” David McCullough, John Adams 52 (Simon & Schuster 2001).
III.
Pursuant to the foregoing,, this is not a close case and we should readily defer to the Board Decision. I respectfully dissent, therefore, from the majority’s surprising decision to substitute its judgment for that of the Board.

. Indeed, the Supreme Court has long recognized the considerable deference we must accord the Board. See, e.g., Auciello Iron Works v. NLRB, 517 U.S. 781, 787-88, 116 S.Ct. 1754, 135 L.Ed.2d 64 (1996) (concluding that reviewing courts must give “considerable deference’’ to the Board “by virtue of its charge to develop national labor policy” (internal quotation marks and citations omitted)); NLRB v. Yeshiva Univ., 444 U.S. 672, 691, 100 S.Ct. 856, 63 L.Ed.2d 115 (1980) (observing that “we accord great respect to the expertise of the Board when its conclusions are ... consistent with the Act”).

. Fellow employee Donald Hale testified that McMillen “got pissed off getting those letters .... He didn't like them. I got one too, and I didn't like mine either.” ALJ Decision at 4.

. Although McMillen testified that he said "fucking idiot,” other testimony was that he said "stupid fucking moron.” See ALJ Decision at 5, 7-8. The Board found no legally relevant difference between the two versions of his statement, but used the words "stupid fucking moron” in its decision.

. The Supreme Court has also recognized an exception for "disloyalty against an employer.” NLRB v. Local Union No. 1229, Int’l Bhd. of Elec. Workers, 346 U.S. 464, 472, 74 S.Ct. 172, 98 L.Ed. 195 (1953). However, McMillen's comment is a far reach from the "disloyalty” exhibited in International Brotherhood, where employees, while still on the payroll, launched a.handbill campaign to undermine the quality of the company's television broadcasts. Id. at 467-69 & n. 4, 74 S.Ct. 172.

. Atlantic Steel establishes the Board's seminal test for determining whether an employee who has engaged in concerted activity can, by opprobrious conduct, lose the Act's protection. See, e.g., Beverly Health and Rehab. Servs., 346 N.L.R.B. 1319, 1322 (2006); Waste Mgmt. of Ariz., Inc., 345 N.L.R.B. 1339, 1340, 1353-54 (2005) (“Where profane and other offensive conduct occurs in the context of a protected concerted activity that potentially removes the conduct from the protection of the Act, the Atlantic Steel test is used."). At least one other circuit has utilized the test. See Felix Indus, v. NLRB, 251 F.3d 1051, 1053-54 (D.C.Cir.2001). We agree with the majority and the Board that Atlantic Steel supplies the proper legal test for this analysis.

. The panel majority also seems to undertake an indirect challenge to the Board’s determination that McMillen was, on the occasion of his comment, engaged in concerted activity. See Board Decision at 2. Although the majority "do[es] not find that [the Board’s concerted activity] conclusion is wrong as a matter of law,” it admonishes that "the conduct in question skirts the outer bounds of that which can be considered concerted activity under the Act's auspices.” Ante at 186. Notably, the facts the majority cites in support of such a dubious proposition — that ‘'McMillen’s derogatory comment was part of a conversation he individually initiated; it was not temporally associated with the actual negotiations in question or the actions that prompted it; and it could not have been directly responsive to the Tribune’s negotiating positions, since McMillen prefaced the remark by stating that he had not yet read Barker's letter,” id. at 186 — are many of the same facts conjured up by the majority in rejecting the Board's analysis of the Atlantic Steel factors. See, e.g., id. at 187-88 (asserting that McMillen’s comment was "divorce[d] ... from the context of the ongoing labor dispute” and "lack[ed] ... concurrence" with Barker's final letter). In any event, the majority declines to disturb the Board’s concerted activity determination— and rightfully so, in view of the solid legal and factual ground on which it stands.

. The Board recognized in Felix Indus, that it is "free, under Atlantic Steel, to consider [employer] conduct that would have been found to be an unfair labor practice had it been so alleged.” 339 N.L.R.B. at 196 n. 5. Here, the Board did not suggest that Barker's letters constituted an unalleged unfair labor practice. Nevertheless, a majority of the Board observed that Barker's letters' "provocative effect on a prounion employee is neither unexpected nor unreasonable,” and that "McMillen may reasonably have been provoked partly by Barker’s repeated hints that the pressmen should decertify the Union.” Board Decision at 3 n. 15. Accordingly, the Board majority recognized that "Barker's statements tend to mitigate the egregiousness of McMillen's outburst, although to a lesser degree than had Barker’s comments been litigated and found to be legally proscribed.” Id.

. The panel majority commendably acknowledges that "the Board has in general found that remarks made in private are less disruptive to workplace discipline than those that occur in front of fellow employees.” Ante at 187 n. 4. Nevertheless, it then injects that, when conversations are "instigated for the express purpose of making vulgar remarks,” the situation is vastly different. Id. This legal proposition, however, simply has no application or relevance to the underlying facts of this proceeding.